**APTUS COMPANY, Plaintiff,**

v.

**The UNITED STATES.**

No. 01–362C.

United States Court of Federal Claims.

Aug. 30, 2004.

S. Emanuel Lin,[1] Houston, Texas, pro se, for plaintiff.

Andrew P. Averbach, Washington, D.C., with whom was Peter D. Keisler, Assistant Attorney General, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge.

## I. INTRODUCTION

The present action arises from the government's termination for default of plaintiff's,

---

1. A sole proprietor doing business as (d/b/a) Ap- tus Company.

Aptus Company's, contract to install government-furnished equipment, and design, manufacture, and install contractor-furnished equipment at the government-owned and operated Sault Ste. Marie Hydroelectric Power Plant (the "Soo") in Sault Ste. Marie, Michigan.[2] The contractor's right to proceed with work on the contract at issue, DACW35–99–C–0001, was terminated for default on June 26, 2000, for failure to make progress,[3] unsatisfactory work and unsound work methodology, and violations of the Davis–Bacon Act. At trial, the government also averred fraud as an additional *post-hoc* rationale to justify the termination decision. Plaintiff, proceeding *pro se*, alleged five (5) counts as separate bases for recovery in his First Amended Petition, which are as follows:

(i) wrongful termination of contract;

(ii) government's breach of contract;

(iii) government's changes to the contract;

(iv) government's breach of federal suretyship law; and

(v) compensation for unjust enrichment.

After significant discovery, we heard this matter over a two-week period. At the close of plaintiff's case-in-chief, the government made a motion for entry of judgment in its favor on all counts, pursuant to RCFC 52(c). We took said motion, and plaintiff's response thereto, under advisement. For the reasons set forth in detail below, we hold that the decision to terminate Aptus for default is supported by substantial evidence, and that Aptus failed to meet his burden with respect to his defense of justifiable delay. Therefore, we uphold the defendant's default termination. Consequently, plaintiff's claim of wrongful termination is DENIED. Further, we hold that the claim of government breach of contract, based entirely on the unavailability of the GFE, merges with, and is subsumed by, plaintiff's affirmative defense of

justifiable excuse. Plaintiff's third claim seeking compensation for changes to the contract is DENIED, as plaintiff failed to meet his burden with respect to such claim. Further, we DISMISS the claim premised upon an alleged breach of suretyship law for want of jurisdiction pursuant to RCFC 12(b)(1). Finally, we find that plaintiff's claim for unjust enrichment is, in fact, an attempt to recover for the work he did during his performance of the contract, and an attempt to recoup the reprocurement costs that the government collected from his surety. Thus, it is not an equitable claim: it is a third restatement of his wrongful termination claim. Consequently, Count V is also merged with, and subsumed by, Count I. Our holdings herein render defendant's motion for entry of judgment in accordance with RCFC 52(c) moot, and it is therefore DENIED.

## II. BACKGROUND

### A. The Purpose of the Contract

The instant contract was issued by the United States through the U.S. Army Corps of Engineers, Detroit District (USACE), as part of a plan to update and automate the equipment at the government owned and operated hydroelectric power plant at the Soo. That facility provides power to the USACE's Soo Area Office, which encompasses the Soo Locks—a group of locks that facilitates commercial ship traffic between Lakes Huron and Superior. Any excess power generated by the Soo is sold to Edison Sault Electric Company (ESELCO), which in turn supplies power to the eastern portion the Upper Peninsula of Michigan. In total, four contracts were issued as part of this Automation Project: three equipment supply contracts, and one installation contract. These four contracts, collectively, call for the installation of automation equipment at five separate gener-

**2.** "Sault Ste. Marie" and "St. Mary's Falls" are used interchangeably throughout the record in this case. For the sake of simplicity and continuity, we shall adhere to the "Sault Ste. Marie" moniker when referring to the town wherein the contract was to be performed, and "the Soo" when referring to the power plant itself.

**3.** The government's Notice of Default Termination, issued on June 26, 2000, and the subse-

quently issued Contracting Officer's Decision, dated June 30, 2000, both cite unsatisfactory work product and unsound work methodology as grounds for termination, as well as failure to make progress. As the decision below explains, we find these issues to be inextricably linked, because it defies logic to include unacceptable work product as "progress."

ating units at the Soo: Units 1–3, 3A, and 10. The equipment contracts were issued to: Voith Hydro, Inc. for governor equipment, Asea Brown Boveri, Inc. ("ABB") for excitation equipment, and Scipar, Inc. for SCADA equipment.[4] The way the Automation Project was structured, a fourth party was required to install the government-furnished governor, excitation, and SCADA equipment acquired under the supply contracts. In addition to installing the GFE, the installation contract required the contractor to modify some portions of existing equipment, and design and install additional equipment necessary for automation.[5]

### B. The Solicitation, Pre–Award Survey, and Award

On July 9, 1998, the government issued a solicitation for bids for the installation contract, with completion required within 450 days from the Notice to Proceed. Plaintiff responded to the government's solicitation for the instant contract, and was the low bidder with a bid of $1,265,110.00.[6] The government confirmed that plaintiff's bid was responsive to the solicitation, and turned its attention to ascertaining whether plaintiff was a responsible bidder with respect to the contract. To make its responsibility determination, the government conducted a pre-award survey.

During its pre-award survey, the government learned that plaintiff had performed three prior government contracts successfully. Those contracts all involved designing and installing SCADA equipment. The government also learned that plaintiff had been awarded an installation contract by the USACE for the Savannah District Power Plant. Said contract was terminated for convenience. The Contracting Officer charged

with administering the contract at bar, Mr. George Fedynski, contacted the Savannah District and found that they considered termination for default. "They considered Aptus Company to be incompetent and wanted to get rid of it, and [termination for convenience] was a convenient way of doing it." Trial Transcript (Tr.) 1321. Concerned respecting the foregoing, Mr. Fedynski participated in the pre-award survey himself, which he does not ordinarily do.

The government learned that Aptus was a single-man operation, consisting only of Mr. Lin. Mr. Fedynski "was very concerned that Mr. Lin did not have any permanent staff." Tr. 1336. As stated above, Mr. Lin had significant experience with SCADA systems, and also holds a B.S. degree in Electrical Engineering, and an M.S. degree in Computer Science. However, Mr. Lin had no prior experience with hydroelectric power plant installation work. Mr. Lin also had no experience with governor or excitation equipment. To allay Mr. Fedynski's concerns, Aptus provided written assurances that he would recruit experienced workers. Relying on (i) these assurances, (ii) Mr. Lin's experience, and (iii) Aptus' ability to obtain the required performance and payment bonds, Mr. Fedynski found that Aptus was a responsible bidder, and thus awarded Aptus the contract at bar on November 5, 1998. A Notice to Proceed was issued and acknowledged on December 9, 1998, thereby starting the clock on the 450–day completion deadline of March 3, 2000,[7] set forth in the contract.

### C. The Default Termination Decision

The contract and its subsequent performance are explored in detail *infra;* however, a brief introduction to the contract require-

---

**4.** SCADA stands for Supervisory Control and Data Acquisition.

**5.** Specifically, the installation contract requires the contractor to design and install a neutral grounding system, a new switchboard and switchgear for Unit 10, a 125 VDC distribution panel, and several other smaller items.

**6.** The bid amount included a line item for "Skilled Labor" that was intended by the USACE to be an option. After entering into the contract, a modification was issued to subtract that line

item from the contract amount, which reduced the total contract price by $40,000.00 to its current $1,225,110.00 price.

**7.** The original contract completion date of March 3, 2000, was extended by 150 days to July 31, 2000, via a bilateral contract modification executed on November 24, 1999. This modification was done, in part, because the delivery of the governor and excitation GFE was delayed; the value of the contract did not increase.

ments, and the allegedly deficient performance of said requirements, is necessary to establish a framework for the substantive analysis to follow. The contract imposes extensive administrative, design, product, and procedure submittal [8] requirements on Aptus. In the earliest stages of contract performance, Aptus displayed difficulty meeting these requirements, which, according to the government, are its primary method of monitoring and measuring progress under the contract. Additionally, Aptus displayed gaps in his understanding of other contract provisions. For example, Aptus submitted his first construction schedule on January 4, 1999, while it was due prior to Christmas 1998. Said overdue schedule, Transmittal 1.0, was disapproved by the government on February 23, 1999. Moreover, the government noted that plaintiff's Transmittal 1.0 failed to take into account at least two significant contract provisions when he formulated his schedule. Namely, Aptus had scheduled the installation of several GFE components prior to the availability of over-water transportation. Said components could not, of course, be transported to their respective power houses and installed therein absent the availability of over-water transportation. Aptus' schedule also reflected generator-outage time in excess of the 21–day outage limitation in the contract.

According to the terms of the contract, disapproved submittals must be revised and resubmitted promptly. Mr. Lin (d/b/a Aptus) resubmitted his construction schedule more than three months later, on May 28, 1999. During the interceding period, the government requested a revised resubmittal from Aptus telephonically, in person, and via written request.

Plaintiff's own testimony and his documentary evidence indicate that the difficulties he encountered with respect to submittal of his construction schedule were not atypical; the record in this case provides numerous examples of delayed and/or delinquent submittals. The government, however, experienced delays of its own relating to delivery of the governor and exciter GFE components. Acknowledging that its delay likely hindered Aptus' performance, the government agreed to extend the performance period of the agreement by an additional 150 days as full compensation for the GFE delivery delays. A bilateral modification of the contract, setting a new completion date of July 31, 2000, was, therefore, executed on November 24, 1999.

On January 14, 2000, just seven (7) weeks after execution of the contract modification extending delivery to July 31, 2000, the government issued a cure notice to Aptus. Said notice averred that Aptus was unable to make sufficient progress under the contract, failed to comply with required submittals, failed to provide a realistic work schedule, and had inadequate staffing to perform the work required under the contract. On January 31, 2000, Aptus submitted a handwritten response to the government's cure notice, advising the government of his hiring efforts. Mr. Lin supplemented his January 31, 2000 response on February 4, 2000, and attached several required submittals to his response.

After reviewing Aptus' response to the cure notice, the government opted to forebear with respect to default termination, but advised Aptus that it was "critical that you

---

**8.** "Submittal" requirements are defined by the contract. Under the contract, the contractor is required to submit various information to the government, either strictly for informational purposes, or for government approval. Collectively, these requirements are referred to in the contract, and herein, as "Submittal Requirements." There are four primary types of submittals that Aptus must transmit to the government, pursuant to the contract, to wit: administrative, design, procedure, and product. The following are examples of each submittal type:

- Administrative: e.g., employee lists, contractor's quality control plan,
- Design: e.g., technical drawings for the Unit 10 switchgear design, design for neutral grounding system,
- Product: e.g., the part numbers, catalog information, and specifications for component parts required by the design/installation work, and
- Procedure: e.g., written plan setting forth (i) the disassembly of each generating unit's existing generating equipment and (ii) the assembly and installation of the new generating equipment.

In addition to setting forth the required submittals and the contents thereof, the contract also imposes time deadlines on the contractor for submittals.

have an organization, which includes a correct mix of workers to successfully complete the contract." Plaintiff's Exhibit in evidence (PX) 252. Aptus was also cautioned to comply with the labor provisions set forth in the contract.

Subsequent to the issuance of the cure notice, the Contracting Officer requested that the Hydroelectric Design Center (HDC)—a division of the USACE—inspect the quality and progress of Aptus' work. The HDC inspection, conducted between April 4 and April 6, 2000, uncovered deficiencies in Aptus' work. A full report of the results of the inspection, along with the HDC's recommendation to terminate Aptus for default, was prepared for the contracting staff[9] in April, 2000. After discussions with his contracting staff, Mr. Fedynski issued a show cause letter to Aptus on May 1, 2000, approximately three months after his decision to forebear on Aptus' termination for default. Therein, the government cited the results of the HDC inspection, and stated that the conditions noted in the January 14, 2000 cure notice had not been cured. The show cause notice required Aptus to respond within ten (10) days, however, Mr. Fedynski granted Aptus' request to extend the time to respond to May 18, 2000. Mr. Fedynski took that opportunity to remind Aptus that his response had to specifically address each condition cited in the show cause notice.

Mr. Lin timely submitted his response to the show cause notice. Mr. Fedynski distributed said response to both his delegates and the HDC for their evaluations. The HDC authored an extensive evaluation of Aptus' response, and concluded that it was inadequate and unresponsive. On June 3, 2000, Mr. Fedynski agreed to delay his decision regarding termination, at Aptus' request. In the interim, Mr. Lin consulted with members of the contracting staff, and made various attempts to correct the deficiencies noted in the show cause notice in an effort to stave off termination for default.

Finding that, as of June 26, 2000, Aptus had failed to correct and/or excuse the deficiencies cited in the notice to show cause, Mr. Fedynski terminated Aptus' right to proceed under the contract for default, per FAR § 52.249–10. The government issued its findings of fact with respect to the decision to terminate on June 30, 2000.

Thereafter, Mr. Lin urged Mr. Fedynski to reconsider the termination, and ultimately submitted a formal request for reconsideration on July 24, 2000. Notwithstanding the foregoing, the contracting staff was singularly unpersuaded. Following thereon, the government entered into a Tender Agreement with Chatham Reinsurance Corporation (Chatham), Aptus' bonding company, on September 8, 2000. The Tender Agreement's terms establish the government's acceptance of Chatham's tender of: (i) L & S Electric as the completion contractor, and (ii) $188,887.00 to compensate the government for excess reprocurement costs.

## III. PROCEDURAL POSTURE

Aptus certified and filed his claims against the government on April 16, 2001, seeking an equitable adjustment to the contract and a conversion of the default termination to a termination for convenience. FAR § 52.249–10(c). Furthermore, Aptus asserted that the government materially breached the contract. Additionally, Aptus alleged that the government violated federal suretyship law when it entered into the September 8, 2000 Tender Agreement with Chatham Reinsurance, and that the government was unjustly enriched by Aptus' performance.[10]

The Contracting Officer denied Aptus' claims, and Aptus then timely filed the instant action on June 18, 2001. Aptus' First Amended Petition seeks reversal of the Contracting Officer's decision denying Mr. Lin's

9. "Contracting staff" is used herein to collectively refer to Mr. Fedynski and his technical and administrative delegates, some of whom were then located at the Soo Area USACE Office, while others worked out of the Detroit District Office of the USACE.

10. Aptus enumerated several other allegedly wrongful acts purportedly committed by the government. A close reading of these claims, however, reveals that Aptus relies on identical facts and requests identical relief in most of these claims. He simply does it in such a way to make the claims appear distinct by calling each claim something slightly different.

April 16, 2001 claims. Specifically, Count I of the complaint at bar asserts wrongful termination for default, and seeks conversion of the default termination to termination for convenience. Aptus avers that his progress delays and submittal deficiencies should be excused based on governmental delay arising from late and/or defective GFE delivery. The second count charges that the government breached the contract, curiously for some of the same reasons averred in Count I, thus entitling Aptus to damages resulting from said breach. In the third count, Aptus alleges that the government "conspired and ultimately succeeded in the misuse of *Default* clause to change the manner of contract performance and to shed the increased cost of such changes upon Aptus." Compl. 9.[11] Next, Count IV avers "Government's Breach of Suretyship Law." Therein, Aptus alleges that it was unlawful for the government to demand performance from Aptus' surety, Chatham Reinsurance Corporation. This allegation stems from the fact that the government revoked Chatham's certificate of authority as a federal surety on March 31, 2000. In Count V, the last, Aptus asserts that the government was unjustly enriched by Aptus' contract performance, and seeks compensation based on principles of equity.

After extensive discovery, this matter proceeded to trial, with plaintiff appearing *pro se.*[12] Over the course of the two week trial, commencing on May 24, 2004, plaintiff introduced 345 exhibits into evidence, and conducted direct examinations of seven witnesses in his case-in-chief.

As we have noted in fn. 12, plaintiff was somewhat disadvantaged by proceeding *pro se.* Given said circumstance, and in the interest of justice, this court diligently examined the entire record in an effort to clearly ascertain the facts of this case, and give plaintiff's claims every reasonable opportunity to prevail, if the facts so warrant.

## IV. JURISDICTION

This court has jurisdiction over claims for monetary damages lodged against the United States that arise out of contracts to which the United States is a party. 28 U.S.C. § 1491. Plaintiff's claims in this court were filed only after they were denied by the contracting officer, as required by the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–603. Consequently, Count I of plaintiff's complaint for wrongful termination, wherein he seeks conversion of the default termination to one for the convenience of the government, is properly before this court. As previously noted, Count II alleges breach of contract, but the factual averments are, upon closer examination, identical to Count I. Both counts assert that the government caused delays, and then improperly terminated Aptus for default. Since the relief that we may grant for these types of alleged wrongs is governed by the Federal Acquisition Regulations, we can come to a single result. Thus, in our discussion, *infra,* we find that Count II merges with, and is subsumed by, Count I. The third count of the complaint alleges that "Government's Changes to the Contract" unfairly visited

11. "Compl. ___@" is a citation to Plaintiff's First Amended Petition.

12. We note at this posture that the court implored Mr. Lin to retain counsel throughout the pre-trial stage of the proceedings. Self-representation is a daunting task, even if one is learned in the law, for it has often been stated that—"the attorney who represents himself has a fool for a client." Mr. Lin's challenge was made even more difficult because he lacks legal training and is not a native English speaker. Nonetheless, as is his right, Mr. Lin instead elected to represent himself, noting to the court that he had been unable to secure counsel on a contingent-fee basis, and did not wish to make substantial outlays for legal fees. Tr. of December 18, 2003 Hrg. on D's Mot. for Sanctions at 18. This, we opine, is one of many "penny-wise, pound-foolish" decisions made by Mr. Lin during the course of these proceedings. Another exemplar is plaintiff's curious decision to present no witnesses on his behalf, other than himself and government personnel that defendant proposed to call in its case-in-chief. This decision was made upon Mr. Lin's realization that he would be obligated to underwrite the travel expenses of additional witnesses. Thus, Mr. Lin placed himself in the awkward predicament of drawing all of the critical testimonial evidence for his case-in-chief from himself, the contracting staff, and HDC personnel (the latter two groups, according to Mr. Lin's own exhibits, unanimously agreed with the decision to terminate Aptus for default). These choices, no doubt, exacerbated plaintiff's uphill battle.

increased costs upon Aptus, warranting an equitable adjustment to the contract price. We note that this claim, too, merges into Count I if said count is determined in favor of plaintiff.[13]

Count IV, in contrast to the aforementioned claims, seeks damages for "Government's Breach of Suretyship Law." This is not a cognizable claim over which we have jurisdiction. *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Plaintiff bases his theory of recovery on the March 31, 2000 published decision of the U.S. Department of the Treasury, which revoked the Certificate of Authority previously issued to plaintiff's surety, Chatham Reinsurance Corporation. The Federal Register text contained the government's decision to remove Chatham from the list of approved suretyship providers for the purposes of government contracting, pursuant to 31 U.S.C. §§ 9304–9308.[14] 65 Fed.Reg. 78 at 21,603 (March 31, 2000). Further, it advised bond-approving officers that they should no longer accept surety guarantees from Chatham. *Id.* Additionally, it counseled that "bond-approving officers should secure new bonds with acceptable sureties in those instances where a significant amount of liability remains outstanding." *Id.* Thus, Mr. Lin contends that the contracting officer was in violation of this instruction, therefore in violation of federal suretyship law, and that these violations caused Mr. Lin damages of "at least [ ] $916,050.02." Compl. 11. Mr. Lin adduced no testimony at trial relating to this claim, and the only evidence even remotely relating to this issue is the Federal Registry citation, and the Tender Agreement that Chatham and the government entered into after the publication of the revocation.

Our jurisdiction is narrowly defined by Congress in the Tucker Act, and extends to contract claims for money damages against the government, and "money-mandating" provisions [15] of the Constitution, Acts of Congress, or executive regulations, to which the plaintiff alleges a specific entitlement. *See United States v. Testan*, 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. King*, 395 U.S. 1, 2–3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *United States v. Sherwood*, 312 U.S. 584, 587–88, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). For the benefit of *pro se* plaintiff, a "money-mandating" provision is defined as a substantive law that, when viewed on its face and fairly read, plainly mandates compensation by the federal government for any damage sustained by the claimant. *See United States v. Mitchell*, 463 U.S. at 216–17, 103 S.Ct. 2961 (quoting *Testan*, 424 U.S. at 400, 96 S.Ct. 948). An illustrative example is the Fifth Amendment's requirement that "just compensation" be paid when the government effects a taking of private property. In contrast, the suretyship provisions that Mr. Lin claims are at issue here contain no such mandate. Thus, this claim fails to fall within our grant of jurisdiction under the Tucker Act. 28 U.S.C. § 1491. We are, therefore, constrained to dismiss this claim for lack of subject matter jurisdiction, pursuant to RCFC 12(b)(1). *See, e.g.*, *Testan*, 424 U.S. 392, 96 S.Ct. 948, *supra.*

Finally, Mr. Lin asserts Count V, entitled "Unjust Enrichment." The relevant portion of the complaint with respect to this count asserts, in its entirety, the following:

> The original contract was to be completed in 450 days at a price of $1,225,000. After 570 days of contract performance under APTUS, Government terminated

---

13. "Where the contractor has been terminated for default and his claim is for termination for convenience damages on the basis that the default termination was wrongful, this court has held that plaintiff's claims for cost adjustments are mooted by the default and subsumed in the termination for convenience damage claim." *PBI Elec. Corp. v. United States*, 17 Cl.Ct. 128, 130 (1989) (citing *Ralcon, Inc. v. United States*, 13 Cl.Ct. 294, 296 (1987)).

14. 31 U.S.C. §§ 9304–9308 authorize the acceptance of corporate surety companies on bonds given to the United States.

15. Clearly, the regulation at issue was promulgated to protect the government's interest, not the interests of any other party. No matter how creatively one reads the Federal Registry text cited by Mr. Lin, it is impossible to discern a mandate of payment by the government if a contracting officer fails to heed the warning to acquire a new bond.

the contract with a total of roughly $55,000 payment to APTUS and a gain of $188,887 arising out of the performance bond furnished by APTUS. Constructively, not only did the Government receive 570 days, or roughly 3–man–years, of service from APTUS for free, it had a windfall of roughly $125,000 under its failure to deliver Government-furnished property at the time of contract termination. There exists disproportional inequity between the contracting parties and Government's unjust enrichment is obvious.

Compl. 12.

Because we are faced with a *pro se* plaintiff, the court feels an obligation to clarify Mr. Lin's claims where the evidence so permits. We cannot, however, litigate his claims for him. Here, we read plaintiff's allegations as arguing simply that the government received Aptus' services *under the contract,* and failed to pay Aptus accordingly. Aptus seeks the compensation to which he believes he is entitled under the contract, and a recapture of the excess reprocurement costs that the government collected from Chatham. Positing these allegations as arising "in equity" as opposed to "at law" is a misstatement of the true nature of the claim. As noted, Aptus is claiming damages for work done under the contract, for which he was not paid. That is a contract claim presented at law; asserting a contract claim nominally as an equitable action (unjust enrichment) does not alter its nature. Since Count V is the *third,* duplicative, and redundant statement of Mr. Lin's contract claim for wrongful termination, the facts alleged therein are also merged into, and subsumed by, Count I. To the extent that he truly seeks compensation for a contract implied-in-law (unjust enrichment),[16] this court does not have jurisdiction. *See, e.g., Hatzlachh Supply Co. v. United States,* 444 U.S. 460, 465, 100 S.Ct. 647, 62 L.Ed.2d 614 n. 5 (1980) (citing *Alabama v. United States,* 282 U.S. 502, 507, 51 S.Ct. 225, 75 L.Ed. 492 (1931); *Goodyear Tire & Rubber Co. v. United States,* 276 U.S. 287, 292–293, 66 Ct.Cl. 764, 48 S.Ct. 306, 72 L.Ed. 575 (1928); *United States v. Minn. Mutual*

*Investment Co.,* 271 U.S. 212, 217, 46 S.Ct. 501, 70 L.Ed. 911 (1926); *Hill v. United States,* 149 U.S. 593, 598, 13 S.Ct. 1011, 37 L.Ed. 862 (1893)).

Given all of the foregoing, we find we are now faced with only two cognizable claims, to wit, Counts I and III, and shall decide them both in turn.

## V. DISCUSSION

### A. Count I—Wrongful Termination

#### 1. Standard of Review

■ This court reviews a contracting officer's termination for default *de novo.* 41 U.S.C. § 609(a)(3); *Seaboard Lumber Co. v. United States,* 903 F.2d 1560, 1562 (Fed.Cir. 1990). When a contractor challenges the government's default termination of his contract, the government bears the burden of proof as to the propriety of said termination. *See, Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 765 (Fed.Cir.1987). The government must establish, by a preponderance of the evidence, that the default termination was justified. *Id.* Thus, if we find that, based on the entirety of the record, the greater weight of the evidence supports the termination for default, we must uphold the termination. If, on the other hand, the evidence is evenly balanced, the government has not met its burden and the termination shall be converted to one for the convenience of the government, pursuant to FAR § 52.249–10(c).

■ In the case at bar, the government alleges that the contractor committed fraud in the performance of the contract among the various grounds that it contends justify the default termination. Thus, we note here that proof of contractor fraud must be established by *clear and convincing* evidence. *Daff v. United States,* 31 Fed.Cl. 682, 688 (1994) (citing *Joseph Morton Co. v. United States,* 757 F.2d 1273, 1278–79 (Fed.Cir.1985)). The clear-and-convincing standard of proof places a higher burden on the government than the mere preponderance-of-the-evidence stan-

---

**16.** "[A] contract implied-in-law is one in which no actual agreement between the parties occurred but where a duty is imposed by equity to prevent injustice." *Contel of Cal. v. United States,* 37 Fed.Cl. 68, 72 (1996) (citations omitted).

dard, but not so high a burden as to require the trier of fact to be convinced of the matter beyond a reasonable doubt. *Addington v. Texas*, 441 U.S. 418, 431, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). In other words, allegations of fraud must be established as to clearly convince the trier of fact that the fraud occurred.

■ The plaintiff asserts that the government seriously hindered his performance because of delivery delays and defects relating to the GFE. In essence, plaintiff avers that any delay in his performance was caused by the government, and as such, plaintiff's delays are excusable, pursuant to FAR § 52.249–10(b)(1), (c). The burden of proof with respect to excusable delay is borne by the plaintiff. *Morganti Nat'l, Inc. v. United States*, 49 Fed.Cl. 110, 132 (2001), *aff'd* 36 Fed.Appx. 452 (Fed.Cir.2002). Further, plaintiff must establish his affirmative defense of excusable delay by a preponderance of the evidence. *Id.* Thus, if we find, by a preponderance of the evidence, that plaintiff failed to make adequate progress under the contract, or failed to comply with the contract's submittal requirements, we shall then determine whether that deficient performance was the result of government delay. If the preponderance of the evidence supports the conclusion that the deficiencies are the result of excusable delay, the termination for default shall be converted to a termination for convenience. On the other hand, if we determine that default termination is justified based upon contractor fraud, or a material breach of the contract, or any ground that was unaffected by delay, evidence of government delay—no matter how convincing—becomes entirely irrelevant.

With these standards defined, we turn to the grounds asserted by the defendant in support of the default termination.

### 2. Defendant's Bases for Default Termination

In its Post–Trial brief, the government averred five separate grounds in support of its termination for default: (i) contractor's fraud, (ii) staffing deficiencies, (iii) failure to comply with the submittal requirements, (iv) substandard workmanship, and (v) violations of the Davis–Bacon Act. The government argues that each of these five bases, viewed separately, provide an adequate justification for the court to uphold the default termination. For reasons utterly beyond the court's comprehension, the government failed to argue in its brief that the termination was justified based on plaintiff's lack of progress. The contracting officer's show cause notice [17] and notice of termination cited lack of satisfactory progress. Similarly, Defendant's Pre–Trial Brief focused substantially on failure to make progress. At trial, the government elicited testimony relating to plaintiff's progress throughout the period of performance.

We believe that three of defendant's cited bases more accurately fall into two categories: (i) failure to make progress, and (ii) violations of contract specifications. Namely, defendant's "submittals," "workmanship," and "staffing" categories, in our view, are inextricably linked to the broader issues of overall contract progress and contract adherence. For example, we observe two separate and distinct issues with respect to Aptus' submittal requirements. Evidence in the record relating to Aptus' proceeding with work without first obtaining government approval via the submittal process is probative of Aptus' alleged violations of the contract requirements. To the extent that performing certain portions of work, without adequate approvals, resulted in unacceptable work that was rejected, this evidence is relevant to Aptus' lack of satisfactory progress under the contract as well. Likewise, evidence purporting to show that Aptus' design and installation plan submittals were delinquent and/or absent is probative of failure to make progress. As design work represents

---

17. The Show Cause Notice, issued on May 1, 2000, stated that Aptus "failed to cure the conditions endangering performance as described to you in [the contracting officer's][ ] letter dated January 14, 2000." PX 345. The January 14, 2000 Cure Notice issued to Aptus stated that "the Government considers your inability to make sufficient progress in satisfactory completion of the contract a condition that is endangering performance of the contract." PX 246. Thus, by incorporation, the Show Cause Notice cited failure to make sufficient progress.

$220,200.00 [18] of the contract value, design submittals themselves indicate progress. Conversely, evidence indicating an absence of design submittals indicates a failure to make progress with respect to that contract item. Additionally, installation submittals must be approved prior to commencing specific installation portions of the contract. Thus, to the extent that the evidence establishes that installation submittals were delinquent, said evidence is probative of plaintiff's ability to proceed with the installation portions of the contract—a clear obstacle to progress. Consequently, we find that submittal evidence and workmanship issues are inextricably linked. Further, such evidence shall be evaluated as it relates to "failure to make satisfactory progress," and "violations of contract specifications."

Similarly, evidence purporting to show that Aptus' staffing was inadequate is also properly analyzed in light of the two aforementioned categories. Evidence of inadequate staffing may be posited to show that Aptus had not made, and was unable to make, progress under the contract. Likewise, to the extent that the evidence shows that Aptus did not have staff with the experience mandated by the contract with respect to specific areas or tasks, said evidence is probative of contract violations. Also, insofar as those "unqualified" staff members may have actually performed tasks that they were not competent to perform, pursuant to the contract requirements, said evidence is probative of violations of contract requirements. And, to the degree that this practice required portions of the work to be removed and redone, that evidence is relevant to lack of progress.

In accordance with the foregoing grounds for default, we shall address the following areas seriatim: (i) fraud, (ii) lack of satisfactory progress, (iii) violations of contract requirements, and (iv) Davis–Bacon Act violations. Furthermore, plaintiff's affirmative defense of excusable delay, which may militate against the default termination, shall be explored within the context of progress.

18. Contract line item 0003, in the amount of $220,200.00, represents "Engineering Design

### a. Allegations of Contractor Fraud

"[P]roof of fraud by clear and convincing evidence is a ground for default termination." _Daff,_ 31 Fed.Cl. at 688 (citing _Morton,_ 757 F.2d at 1278–79). Fraud will support a default termination, even when the fraud is not discovered until _after_ the termination, and is offered as a _post-hoc_ justification for the termination. _Morton,_ 757 F.2d at 1277. Further, even if the fraud at issue only affected a small portion of the work performed under the contract, the fraud may taint the whole contract, justifying default termination of the contract in its entirety. _Id.; Daff,_ 31 Fed.Cl. at 688.

At bar, the defendant alleges contractor fraud with respect to two issues. First, defendant claims that plaintiff's proposal of Mr. Lin as a Mechanical Engineer on his "Contractor's Quality Control Plan," (PX 80) submitted for government approval on August 19, 1999, constitutes fraud. Second, the government argues that plaintiff made fraudulent representations to the government regarding his hiring and subcontracting plans during the pre-award survey. We address each of these contentions in turn.

### i. Contractor's quality control plan

On August 19, 1999, Mr. Lin submitted his "Contractor's Quality Control Plan" (CQC) to the government for approval. Therein, Aptus listed Mr. Lin as the party responsible for the quality control of the mechanical portions of the contract. _Id._ Specifically, the CQC states:

> (6) Mechanical Engineer: S. Emanuel Lin The Mechanical Engineer will work on mechanical design and installation of electrical apparatus, such as the installability of the speed disc for governor, the selection of enclosure for Unit 10 switchboard, the layout of electrical apparatus on its front panel, the routing of electrical conduit, partial disassembly of generator for new excitation system, etc.

PX 80.

The government contends, correctly, that Section 01451, para. 3.4.3 of the contract

and Support."

requires that the contractor fill this position—referenced in the contract as "Mechanical Area"—with either a Graduate Mechanical Engineer with two (2) years of experience, or a person possessing at least five (5) years of related experience. Mr. Lin, admittedly, is not a Graduate Mechanical Engineer. Moreover, he testified that he has "rarely work[ed] with generator. [He][ ] did not have hands-on experience on (sic) power generation." Tr. 130. In the government's view, this statement reveals that Mr. Lin's qualifications relating to the "Mechanical Area" are wholly inconsistent with the contract requirements. Thus, the government contends that Mr. Lin's designation of himself as "Mechanical Engineer" on his CQC provides clear and convincing evidence of fraud, because Mr. Lin knew he was neither a Mechanical Engineer, nor otherwise qualified as described in the contract specifications. Accordingly, the government argues that any assertion to the contrary by Mr. Lin was fraudulent. The government cites *Christopher Village, L.P. v. United States*, 360 F.3d 1319 (Fed.Cir. 2004), for the proposition that *any* degree of fraud is material as a matter of law. Further, the government asserts that *Morton*, 757 F.2d at 1278–79, requires us to uphold the default termination based on said fraud, even though the termination did not cite fraud as a basis therefor. While we do not challenge the government's readings of the respective cases, we do not concur with their application to the facts in this case.

First, assuming *arguendo* that this court finds, by clear and convincing evidence, both that plaintiff committed fraud when he submitted his CQC, *and* that said fraud was a material breach of the contract, we do not concur that *Morton* applies to the facts at hand.

In *Morton*, the contractor was terminated for default based on its performance of a contract with the U.S. Department of Agriculture (USDA) to construct certain buildings at the Plum Island Animal Disease Center located on Plum Island, New York. *Morton*, 757 F.2d 1273. After its termination, the corporate plaintiff, along with its

sole shareholder and an employee, was convicted of conspiracy to make false statements, conspiracy to defraud the United States, and for making false statements. *Id.* All convictions arose out of fraud committed in connection with plaintiff's contract with the USDA. *Id.* The various fraud convictions were upheld on appeal. *Id.*

Subsequent to its fraud convictions, plaintiff filed a claim against the government, alleging that its USDA contract was improperly terminated for default based on the grounds cited in the termination decision. The government filed counterclaims, and moved for summary judgment on the wrongful termination claim, relying solely on contractor fraud. The Federal Circuit affirmed the trial court's entry of summary judgment on plaintiff's wrongful termination claim, and held that "if the fraud committed by Morton during performance would support the Government's termination for default if discovered before termination of the contract, evidence of such fraud discovered thereafter would also support a default termination." *Morton*, 757 F.2d at 1277.

Here, the government cannot argue that it was unaware of the alleged fraud at the time of the default termination. Indeed, the "fraudulent" CQC was rejected on August 19, 1999 by the government reviewer on the precise grounds that Mr. Lin did not possess the requisite experience in conformance with the requirements set forth in section 01451, para. 3.4.3 of the contract. The government required Aptus to revise and resubmit his CQC because it knew that Mr. Lin was not a mechanical engineer and did not, in the government's assessment, otherwise possess the requisite experience required by the contract. Thus, there can be no contention by the government that it was unaware of the "fraud" until after the default termination.

In our view, *Morton* and its progeny may permit a default termination to be upheld when the fraud was known at the time of the termination, but not cited as a factor in the termination decision. We contend, however, that under the facts at bar, justifying the termination based on this principle would be unconscionable. This is so because, as we noted above, the government irrefutably

knew about the alleged "fraud" on or about August 19, 1999. Nonetheless, on November 24, 1999—three months after the "fraud" was discovered—the government modified the contract to extend the performance period by 150 days. Further, the termination was not effected until June 26, 2000, some ten months after the allegedly fraudulent statement was made and detected. Because the government, with full knowledge of the alleged fraud, both entered into the contract modification, and also allowed (or, more accurately, *required*) Aptus to continue performance under the contract for ten months, we hold that the government waived its right to assert fraud as its basis for termination at this posture.[19] Any holding to the contrary would represent a blatant violation of the principles of fundamental fairness.

ii. Representations concerning the hiring of employees and consultants

 Defendant's second allegation of contractor fraud centers on representations made by Mr. Lin, both verbal and written, regarding his intentions to hire experienced personnel and consultants to assist Aptus with the performance of the instant contract. The written statements contained in the record were all made during the pre-award survey. For instance, Mr. Lin sent a letter to the contracting staff on October 2, 1998. In said letter, Mr Lin stated that he "plan[ned] to hire Mr. Richard York and two electrical engineer/electrician (sic)..."; he attached a letter of intent to hire Mr. York to this letter. PX 213. Mr. Lin admitted that Mr. York declined his offer to work at the Soo on October 12, 1998, although Mr. York indicated that he would again consider it in the event Mr. Lin was unable to secure other personnel.[20] Aptus failed to inform the government regarding that turn of events. Further, the October 2, 1998 letter stated that he

had received a quote from Kiser–Johnson & Co. for "digital excitation and governor portions of the bid." *Id.* Kiser–Johnson had visited the Soo and prepared a bid for another contractor. Mr. Lin stated that he requested said bid, and that it was "within my estimate." *Id.* The government's own records indicate that he did, in fact, attempt to subcontract with Kiser–Johnson, but they were unwilling to accept his proposal whereby they would supply him with a single supervisor to oversee an Aptus-hired crew. Finally, the letter dated October 2, 1998, states that "Duke Energy in Charlotte, NC has in depth experience in hydro generator rewinding and excitor (sic) repair and is able to serve as consultant/specialist." Mr. Lin stated at trial that he had heard of Duke Energy only to the extent that he knew it was a large company with experience related to the contract; he acknowledged that, at the time he sent the letter, he had not spoken with a representative from Duke Energy, nor had he attempted to do so. Also, Mr. Lin stated, both in the October 2, 1998 letter itself and during his testimony, that he made these various representations to assure the government that he would be able to hire a good mix of people to work on the contract, because he knew that the government had concerns regarding his capabilities.

Additional oral representations were made both before and after the contract was awarded. The government does not contend that Mr. Lin made any such representations after January 14, 1999, when he brought two qualified workers to a meeting with government personnel and personnel from the GFE supply contractors. At that meeting, Mr. Lin introduced the workers, and represented that they would be lending their expertise to the project. Mr. Lin admits that neither

---

**19.** Waiver operates to deprive the government of its right to terminate for default when the government fails to terminate a contractor within a reasonable time after the circumstances that form the basis for termination arise, and the contractor relies to its detriment on the forbearance by continuing with performance. *DeVito v. United States*, 188 Ct.Cl. 979, 991, 413 F.2d 1147 (1969) (discussing government's inability to terminate a contractor for failure to deliver by due date because it waited too long to do so). Stated

differently, "waiver or election is binding, not because of consideration, but on principles of fair dealing or estoppel." John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 963 (3d ed.1995).

**20.** The record is devoid of any evidence tending to indicate that Mr. Lin ever renewed his attempt to hire Mr. York.

worker performed any work under the contract beyond attending the meeting.

We have no doubt that Mr. Lin made each and every statement presented above. Additionally, we are convinced that he made these representations in order to allay the government's concerns regarding his capabilities. Whether Mr. Lin's representations were indeed fraudulent, however, we need not address.[21] This is so because, here again, we find that the facts and circumstances in the record clearly establish that the government knew that Mr. Lin had not hired workers or consultants to assist on the project well in advance of the default termination. First, we note that the CQC, discussed above, clearly indicated that Aptus was still a one-man operation as of August 19, 1999, because it listed Mr. Lin for *every single one* of the many positions defined in the CQC. Also, other documentary evidence establishes that the government knew that Aptus had yet to hire his "crew" as early as March 17, 1999. In fact, lack of staff was a complaint that the government cited frequently throughout the contract performance. For instance, on December 7, 1999, the government sent a letter to Mr. Lin that centered on its concerns that he did "not have the staffing in place...." PX 242. Further, lack of staff was an enumerated concern cited by the government in its January 14, 2000 cure notice. Mr. Lin responded by listing the staff he had hired to date, and noting the dates upon which they were hired. The government elected to forebear default at that time, but indicated when it communicated the forbearance to Mr. Lin that "[i]t is critical that you have an organization, which includes the correct mix of workers to successfully complete the contract." PX 252.

We find that the government is free to argue that Mr. Lin failed to adequately staff the project, resulting in his inability to make sufficient progress and/or breaching specific staffing requirements contained in the contract. As set forth above, however, we further find that the government became aware of the true extent of Mr. Lin's staffing no later than December 7, 1999,[22] yet it continued to require performance under the contract for a minimum of seven additional months. Consequently, we hold that the government cannot justify its termination for default on the basis of these allegedly fraudulent statements made on or before January 14, 1999. As indicated in subsection (i) above, we reach this holding based on the theory of waiver, as explained in detail, *supra*.

### b. Lack of Satisfactory Progress

 In order to uphold a default termination for failure to make progress, the government must establish, by a preponderance of the evidence, that it had a "reasonable belief ... that there was 'no reasonable likelihood that the [contractor][ ] could perform the entire contract effort within the time remaining for contract performance.' " [23] *Lisbon*, 828 F.2d at 765 (internal citations omitted). This analysis does "not turn on the contracting officer's subjective beliefs, but rather requires an objective inquiry." *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1016 (Fed.Cir.2003) (citing *Lisbon*, 828 F.2d at 767). Said analysis requires the evaluation of relevant factors, including: (i) "a comparison of the percentage of work completed and the amount of time remaining under the contract," *McDonnell Douglas*, 323 F.3d at 1017 (internal citations omitted), (ii) "problems with subcontractors and suppliers," *Id.*, (iii) "the contractor's failure to meet its own representations concerning the progress of the work," *Morganti National, Inc. v. United States*, 49 Fed.Cl. at 130 (internal citations omitted), and (iv) "over-all evidence of [the contractor's][ ] fail-

---

**21.** We note, however, that the government stipulated at trial that Mr. Lin made substantial efforts to hire personnel. This is probative of his actual intent when he made statements regarding said intent to hire.

**22.** As we indicated, we find that it is likely that the government knew of the staffing situation as early as March 17, 1999, a mere four months

into the contract performance period, and eight months prior to the bilateral contract modification that extended the performance period by 150 days.

**23.** Subsection (i) of this section discusses the contract completion date and the portion of the work due by that date.

ure to prosecute diligently its work under the contract." *McDonnell Douglas*, 323 F.3d at 1017 (internal citations omitted). In sum, we shall consider each of the above factors, and then assess the totality of circumstances, thereby ascertaining whether the contracting officer was "justifiably insecure about the contract's timely completion" from an objective standpoint. *Discount Co. v. United States*, 213 Ct.Cl. 567, 554 F.2d 435, 441 (1977).

### i. Percentage of work to be completed in the remaining performance period

At the outset, we note that this factor requires us to analyze the amount of *satisfactory* work completed during the eighteen and one-half (18–½) months of performance between the acknowledgment of the Notice to Proceed on December 9, 1998, and the Notice of Termination issued on June 26, 2000. We do not include in this analysis any evidence of Aptus' unsuccessful efforts to complete the work. This is so because, no matter how hard Mr. Lin may have tried to complete the work, if his efforts were ultimately in vain, the effort expended is irrelevant. Moreover, rejected work is not "completed" work, and thus becomes part of the work yet to be completed under this analysis.

Mr. Lin contends that the July 31, 2000 contract completion date is unenforceable. This, he argues, is attributable to various governmental delays, and the non-delivery of the SCADA equipment. While we explore the issue of government delay *infra*, we must briefly address it here so that we have a yardstick by which to measure performance and failure to perform. First, any delays caused by the government that occurred *prior to* November 24, 1999, are wholly irrele-

vant as to any issue currently before this court (including excusable delay). This is so because Mr. Lin asked for, and ultimately received, a 150–day performance extension as compensation for delivery delays he experienced with respect to the governor and excitation GFE.[24] Further, it is clear that all of the governor and excitation components had been delivered to the government, and subsequently transported to their respective power houses to await installation, prior to the contract modification.[25] Thus, as of the execution date of the contract modification (November 24, 1999), Mr. Lin and the government agreed that the substantial completion date for the work under the contract was extended to July 31, 2000, from March 3, 2000.

Plaintiff argues, however, that because the delivery date of the SCADA equipment was unknown as of the date of the November 24, 1999 contract modification, the entire modification is worthless. We cannot agree with that assertion. The plain terms of the modification state that the extension of the performance period was granted to compensate Aptus for late delivery of the governor and excitation equipment. Establishing a separate delivery date for the SCADA portion of the contract was discussed among the contracting staff both before and after the modification. That suggested change did not come to fruition, although perhaps our current task would be easier if it had. Nonetheless, we reject Mr. Lin's argument that the then-unknown SCADA delivery date rendered the July 31, 2000 substantial delivery date without any legal force. Rather, we find that the July 31, 2000 substantial completion date was binding on Mr. Lin with respect to all of the work under the contract, *EXCEPTING* installation of the SCADA sys-

---

**24.** The November 24, 1999 contract modification states:

It has been determined in view of the necessity to compensate for late availability of Government furnished governor and excitation equipment, it is in the best interest of the Government to extend the performance period of this contract. . . . It is . . . understood and agreed that this time extension constitutes payment in full . . . for all delays directly or indirectly attributable to this modification and for performance of the work within the time stated.

PX 212(1A) at Tab P0008.

**25.** Mr. Lin contends that, even after delivery of the governor and exciter equipment, he was delayed due to problems with said equipment, namely, missing and/or defective parts. The issue of delays relating to the governor and excitation equipment installation, allegedly occurring after November 24, 1999, are properly more appropriately addressed as part of our "excusable delay" inquiry, *infra*.

tem. This is so because Mr. Lin agreed to the modification *in toto,* knowing that SCADA delivery could not be predicted. Nonetheless, he failed to negotiate to exclude any portion of the work under the contract due to the unpredictability of the SCADA delivery, although he could have so negotiated. Thus, he cannot now rely on its non-delivery to escape an agreement that he willingly entered. He could not, obviously, have been expected to install equipment that never arrived. Consequently, our evaluation of the percentage of work completed in relation to the time remaining for performance shall not include the SCADA work as "incomplete"; we shall leave that portion of the required work (contract line item 0010) out of our total evaluation. Thus, we shall analyze the proportion of the non-SCADA work that was incomplete as of the June 26, 2000 termination as compared to the proportion of time under the contract that then remained, based on the July 31, 2000 completion date.

The bulk of the evidence regarding the proportion of the total work completed at the time of the default termination was presented by Mr. Lin himself.[26] For example, Aptus was required to design, manufacture, and install a new Neutral Grounding System. It appears to the court that this system is composed of two interrelated subsystems: a neutral grounding protective relaying scheme ("scheme") and a neutral ground resistor system.[27] The manufacture and installation of the two components together constitute $342,360.00 [28] of the overall contract cost (*i.e.,* $1,225,110.00)—which represents approximately 28% of the total contract value.[29]

The contract expressly required that the scheme "be designed by a Registered Professional Engineer with a minimum 5 Years experience in the application of protective relaying for electrical equipment and generators." PX 212(1) at 243. Mr. Lin testified that he did not hire the required engineer to design the scheme until "soon before I wrote the subcontracting plan in June 2000." Tr. 551. In fact, Mr. Lin fixes said date at June 16, 2000 in his June 20, 2000 "Subcontracting Plan"—a mere ten (10) days prior to the issuance of the Notice of Default, and more than one month after Mr. Fedynski issued the Show Cause Notice. Moreover, the record reflects that Mr. Lin was specifically informed, on March 29, 1999, that he should focus his effort on, among other tasks, the design and installation of the ground fault system, because said system is separate and "apart from those associated with installing government furnished equipment." PX 231 at 1. Mr. Lin affirmed that fact during his direct examination of himself as follows:

Question: While waiting for the government-furnished equipment to arrive and to be furnished with the design and as-built of government-furnished equipment, were you able to proceed with other portions of the contract?

Answer: Yes.

Question: What were they?

Answer: The first equipment was ground fault resistor system design.

Tr. 270. Continuing, he notes that he began this portion of the contract in February 1999 and issued a purchase order to Post–Glover Resistors for the design and manufacture of the neutral ground resistor system. He visited Post–Glover during the week of May 17, 1999. During that visit, he asked Post–Glover to refer him to someone capable of designing the scheme, but the party they re-

---

**26.** As the court noted previously, Mr. Lin failed *to do himself* any favors when he elected to proceed *pro se.* In fact, it is fair to say the bulk of the evidence supporting the government's position came out during Mr. Lin's case-in-chief— much of it from his own direct examination of himself.

**27.** The neutral ground resistor system was also referred to as the "ground fault resistor system" at trial. For the sake of clarity and continuity, we shall use the "neutral ground resistor system" nomenclature, unless we are quoting testimony.

**28.** The Neutral Grounding System is contract line item 0011, which encompasses the manufacture and installation of the system only. The engineering design incidental to the system is properly part of contract line item 0003, entitled "Engineering Design and Support."

**29.** As noted, *supra,* the design of the Neutral Grounding System is not included in this cost. A portion of the separate "Engineering Design and Support" line item (0003—$220,200.00) is allocable to the design of the Neutral Grounding System. See footnote 34, *infra.*

ferred him to failed to possess the necessary qualifications.

As we previously noted, the ground fault system is comprised of two interrelated items. Despite his efforts, Mr. Lin never made a single design submittal throughout the entire eighteen and one-half (18–1/2) (December 9, 1998 through June 26, 2000) month performance period with respect to the scheme. Nor did he ever receive approval for design of the neutral ground resistor system.[30] Thus, it is clear to this court that Mr. Lin failed to make any significant headway with respect to the 28% of the contract work allocable to the Neutral Grounding System manufacture and installation (contract line item 0011). To the extent that Mr. Lin contends that this portion of the work was negatively impacted by the absent SCADA equipment, we disagree, based on his testimony above wherein he states that he was able to make progress on said system "[w]hile waiting for government furnished equipment." Tr. 270. Our finding is further supported by the testimony of Mr. Steven Rose, the current Chief of the Electrical Branch at the Soo, who testified at the trial that the completion contractor designed and implemented its neutral grounding system prior to SCADA equipment delivery. Tr. at 1325.

In addition to problems with the neutral grounding system, Mr. Lin admitted during his cross-examination by the government that, as of the termination date, he had completed only a small portion of the installation work required under the contract. Moreover, Mr. Lin acknowledged in his May 18, 2000 "Response to Show Cause" that he in-

stalled conduit(s) that did not conform to the contract requirements that conduit(s) be at least ¾", and he cut "less than 50% of electrical conduits at Unit 10" with a type of cutter *expressly prohibited* under the contract. PX 276 at 28. Mr. Lin contends that these violations are minor and do not require rework; conversely, the government disagreed and noted that they rejected said work, as is its right.[31] Thus, said work is not "progress."

The contract also allocates $57,750.00 in cost for the manufacture and installation of a new Unit 10 Switchboard (contract line item 0012). As reflected on Mr. Lin's June 19, 2000 "Revised Construction Schedule," he had not, at that time, submitted his design of said component for government review.[32] The contract provides forty-five (45) days for government review of all submittals requiring government approval. Accordingly, even if Mr. Lin submitted an acceptable design at that precise moment in time, he had no right to expect it to be approved prior to the contract's July 31, 2000 completion date.[33] Without design approval, no manufacturing or installation activities are permissible. Thus, we are constrained to conclude that this portion of the work under the contract, representing $57,750.00 of the total contract price of $1,225,110.00 (approximately 5%), had not been started as of the date of termination (June 26, 2000).

Perhaps most relevant to this determination of the work to be completed in the remaining performance period is plaintiff's Revised Construction Schedule, prepared on June 19, 2000—a week prior to the date of termination. This schedule reveals that the

---

**30.** We also find it noteworthy to mention that Mr. Lin stated that he did not "have experience in the design of ground fault resistor system or ground fault detection scheme." Tr. 286. Yet, as of July 21, 1999, Post–Glover "had already presented two rounds of design (sic), [and] their budget for further revision had been exhausted." PX 276 at 4. At that time, he had failed to make a submittal of Post–Glover's design to the government. Instead, Mr. Lin himself redesigned Post–Glover's submission, seemingly in lieu of increasing Post–Glover's design budget.

**31.** The government raises numerous other issues relating to Aptus' workmanship. We do not wish to belabor the issue here, as it will be explored in

the context of "Violations of contract requirements," *infra.*

**32.** The design of the Unit 10 Switchboard is not part of contract line item 0012; it is part of line item 0003—Engineering Design and Support. See footnote 34, *infra.*

**33.** If Mr. Lin had submitted his design on June 19, 2000, the government was not required to return its review of said design until August 4, 2000 (forty-five (45) days thereafter). In actuality, the Revised Construction Schedule stated that the Unit 10 Switchboard design was scheduled for completion on July 22, 2000.

following additional items remained incomplete as of that date:

- Design submittals [34] for the: neutral grounding resistor system, neutral grounding protective relay scheme, Unit 10 switchboard, and Unit 10 switchgear modification,
- Automation of Units 1–3, 3A, 10,[35] and
- Modification of the Unit 10 switchgear.

The contract assigns $433,088.33 [36] of the total contract price to the above-listed items. When this amount is added to the value of the manufacture and installation of the: (i) neutral grounding system ($342,360.00), and (ii) Unit 10 switchboard ($57,750.00), discussed *supra*, we arrive at a total of $833,198.33. Thus, we must hold that, at a minimum, work totaling $833,198.33 of the total contract price of $1,225,110.00 was incomplete as of the termination date (June 26, 2000). This aggregate work that was incomplete represents 68% of the contract work, *including* the SCADA portions of the contract.[37] In fact, much of that work had yet to be started.[38] The percentage of the time of performance that remained was approximately 5.8%, or a mere 35 work days (35 ÷ 600).[39] Furthermore, even if we assume that, prior to the November 24, 1999 contract modification extending contract performance by 150 days, Aptus was completely unable to perform *any* portion of the contract based *entirely* on government delay, a mere 35 days

34. All design submittals are scheduled for payment under the contract as part of contract line item ("CLIN") 0003–Engineering Design & Support, which is allocated $220,200.00. We assigned a dollar value to each specific design by pro-rating the $220,200.00 value of this line item thusly:
 1. We formulated an "Adjusted Contract Price" ("AKP") equal to the total contract price *minus* CLIN 0003 ($220,200.00). Thus, AKP = $1,004,910 ($1,225,110—$220,200.00).
 2. We correlated each specific design to the CLIN representing the manufacture/installation of the designed component. For instance, the Unit 10 Switchboard design correlates to CLIN 0012—Unit 10 Switchboard ($57,750.00).
 3. Then, we used the dollar amount attributed to each corresponding component as our numerator, and divided said amount by our Adjusted Contract Price. This calculation results in a ratio. *E.g.*, Unit 10 Switchboard calculates as $57,750 ÷ $1,004,910 = ~.0575.
 4. Finally, we multiplied each ratio by $220,200.00. The resulting product is our pro-rated cost of a specific design. *E.g.*, Unit 10 Switchboard design is valued at $12,654.42.

35. Here, because we cannot clearly ascertain which items of work listed on this schedule under each generating unit are part of the governor installation versus the exciter installation versus Aptus-furnished equipment installation, the word "automate" here includes all work necessary for the automation of each generating unit, except (i) SCADA installation (which is listed separately on the schedule) and (ii) other items separately noted herein (e.g., Unit 10's switchboard and switchgear modifications).

36. This $433,088.32 amount is the sum of the following:

Neutral Grounding System Design
per FN 34: [CLIN 0011 (342,360) ÷ AKP (1,004,910)] × $220,200 (CLIN 0003) = $75,019.33
Unit 10 Switchboard design
per FN 34: [CLIN 0012 (57,750) ÷ AKP (1,004,910)] × 220,200= $12,654.42
Unit 10 Switchgear design
per FN 34: [CLIN 0014 (72,400) ÷ AKP (1,004,910)] × 220,200= $15,864,58
Units 1–3 Governor installation (CLIN 0007)= $65,550.00
UNITS 1–3 Excitation installation (CLIN 0004)= $76,900.00
Units 3A Governor installation (CLIN 0008)= $23,350.00
Units3A Excitation installation (CLIN 0005)= $21,300.00
Units 10 Governor installation (CLIN 0009)= $28,650.00
Units10 Excitation installation (CLIN 0006)= $41,400.00
Units 10 Switchgear modifications (CLIN 0014)= $72,400.00.

37. That percentage climbs to 74.3% when the total contract price is adjusted to exclude the SCADA portion of the work (line item 0010 = $103,100.00).

38. *E.g.*, neither the manufacture and installation of the neutral grounding system ($342,360.00), nor its design ($75,019.33) had begun at the time of termination.

39. This is based on the 35 days remaining between the June 26, 2000 termination date and the July 31, 2000 substantial completion date as a percentage of the 600 day performance period granted by the contract and its November 24, 1999 modification (35 ÷ 600).

remained at the time of termination. Viewed in proportion to the 150–day performance window granted by the modification, the percentage of time remaining for performance still only equates to 23.33%. Thus, 68% of the total contract work remained incomplete at the time of termination yet, at best, only 23.33% (and at worst, a mere 5.8%) of the performance period remained in which to complete the contract. Resultantly, when viewed using either measure of time remaining for performance (5.8% or 23.33%), we hold that this factor weighs heavily in favor of the government's position.

### ii. Problems with subcontractors and suppliers.

Another factor relevant to the court's progress determination is the extent to which the contractor experienced difficulties with subcontractors and suppliers. Mr. Lin's formal response to the contracting officer's notice to show cause indicates significant difficulties with his subcontractors. Further, it appears that Mr. Lin believes that he should not be held responsible for the delinquent performance of his subcontractors. For instance, he states: "[d]esign and submittal should have been Post–Glover's job. Since they refused to provide further revision on Units 3A and 10, I became their unpaid designer. They are the sole source." PX 276 at 4. Comments like the foregoing indicate that Mr. Lin believes that subcontractor difficulties that "forced"[40] him to take over "their" work should not be chargeable against him. The work in question, no doubt, remained Aptus' responsibility at all times. Thus, while Mr. Lin appears to assert subcontractor difficulties in *defense* of his lack of progress, in truth, those difficulties weigh directly and fully against him.

In addition to the problems Mr. Lin had with Post–Glover (his source for the design and manufacture of the neutral ground resistor system), he cites problems with RSE–Sierra (his initial source for the design and manufacture of the Unit 10 switchgear):

RSE–Sierra's design arrived....I questioned [their][ ] construction...[fearing it] may not survive the freight from California to Soo, MI. The narrow belts would cut into open-wound CT winding on every road bump like shaking the brain in the baby's head.

RSE–Sierra requested and received the cancellation of the purchase order simply because they said they had enough of this kind of questions (sic).

*Id.* at 8. Consequently, Mr. Lin had to find another subcontractor. In this connection, he turned to Power–In–Control as his source for the switchgear. He notes that Power–In–Control promised him drawings in 1–2 weeks, yet Mr. Lin notes that said drawings did not arrive for seven (7) weeks. Ultimately, and for reasons unknown to the court, Mr. Lin assumed the job of revising Power–In–Control's original designs.

In addition to these three subcontractors, Mr. Lin experienced difficulty recruiting a Registered Professional Engineer to whom he could subcontract the design work required for the neutral grounding protective relay scheme. He failed to secure a subcontractor for that task until June 16, 2000. Moreover, while the contract required a mechanical engineer to oversee the mechanical portions of the contract, Mr. Lin never successfully hired a mechanical engineer. He did state, in his "initial" handwritten reply to the January 14, 2000 cure notice, dated January 31, 2000, that he hired Gary Horner—a mechanical engineer—but Mr. Horner quit before he started.[41]

Taken together, we find ample evidence in the record to hold that Mr. Lin encountered significant problems with his subcontractors. Further, these difficulties had not been resolved prior to the default termination. Thus, we find that said difficulties provide support for the contracting officer's justifiable concern regarding Aptus' ability to complete his contractual obligations in a relatively timely manner.

---

**40.** In truth, Post–Glover asserted merely that they had exhausted their budget for design revisions; they did not state an absolute refusal to continue revisions.

**41.** Aptus' inability or unwillingness to maintain appropriate staffing levels is explored in subsection iv, *infra.*

iii. Contractor's failure to meet his own representations concerning the progress of the work

Evidence of Aptus' inability to make progress in accordance with his own representations is an important factor in our evaluation of his failure to make progress. The record is replete with Aptus' statements indicating that specific tasks would be accomplished by certain dates. However, so that we do not belabor this issue by presenting redundant evidence, we shall focus our discussion solely on Aptus' Construction Schedules. We find said schedules are the most probative of this issue, as they are in writing, and bear the signature of Mr. Lin as the sole proprietor of Aptus. Moreover, they reflect representations made directly by Aptus (Mr. Lin), without any distortion of Aptus' assertions.

Over the course of his performance, Aptus submitted six (6) separate construction schedules for approval. Only three (3) such schedules were submitted for government review subsequent to the November 24, 1999 no-cost contract extension. Thus, these schedules reflect representations made by Aptus after the governor and excitation equipment arrived and had been delivered to the appropriate power houses. Below, we list the delivery dates indicated for particular items across all three construction schedule revisions.

| | Transmittal 1.4 | Transmittal 1.5 | Transmittal 1.6 |
|---|---|---|---|
| Dated: | 12/04/99 | 02/07/00 | 06/19/00 |
| Design for Neutral Grounding Resist. | 12/11/99 | 03/04/00 | 07/15/00 |
| Ground Fault Detect. Scheme | 02/19/00 | 03/11/00 | 08/19/00 |
| Unit 10 Installation [42] | 08/22/00 | 08/05/00 | 02/24/01 |
| Unit 1 Installation | 06/24/00 | 06/24/00 | 01/13/01 |
| Unit 2 Installation | 08/01/00 | 07/01/00 | 01/27/01 |
| Unit 3 Installation | 07/15/00 | 07/15/00 | 02/10/01 |
| Unit 3A Installation | 06/17/00 | 06/17/00 | 12/23/00 |

Each date above is a specific representation, made by Aptus, concerning his anticipated progress. Together, this table encompasses more than six months' worth of Aptus' scheduling representations with respect to almost all of the work under the contract. During that period, Aptus was unable to meet even a single scheduling deadline that he placed upon himself, as shown by the fact that Mr. Lin changed all but one date listed on Transmittal 1.4 by the time he submitted Transmittal 1.5 (submitted two months later). And, *each and every completion date* that Mr. Lin proposed on Transmittal 1.6 represented a change from Transmittal 1.5. Such extensive inability to conform to his own schedule is a clear indication that Aptus' work under the contract was simply failing to progress at the rate Mr. Lin himself believed it should. Our analysis of this factor provides significant support for the Contracting Officer's justifiable insecurity regarding Aptus' timely completion of the work.

iv. Aptus' failure to diligently prosecute the work under the contract

Evaluation of a contractor's diligent prosecution of the contract provides us an opportunity to address other evidence probative of a failure to make progress that did not heretofore come under discussion, *supra*. Before we analyze whether Aptus failed to diligently prosecute the work under the contract, we are compelled to note that our discussion of this factor is not an assessment of the personal effort Mr. Lin set forth. If that was our ultimate goal, the court would simply state that the record evidence establishes that Mr. Lin worked very hard on the contract. There is no allegation that he did not try his very best, nor that he did not expend tremendous personal effort.

---

**42.** Here again, the court is unwilling to attempt to parse out which activities are part of the governor installation versus the excitation installation versus the contractor-supplied equipment installation. Thus, this date for "installation" at each power house is the date that all tasks listed for each specific generating unit are scheduled for completion.

This factor instead requires that we look at the results of the contractor's efforts, not simply the sweat he expended. Part of our analysis must center on the government's allegations that Aptus failed to adequately staff the project with workers possessing the correct mix of skills required for satisfactory progress. In this regard, the evidence in the record establishes that Mr. Lin did not have a single person working with him on site from the date he acknowledged the notice to proceed (December 9, 1998) until early January, 2000.[43] During the interceding period, Mr. Lin attempted to fulfill all of the contract requirements by himself, with the exception of the three subcontractors he hired to design and manufacture the Unit 10 switchgear (RSE–Sierra, Power–In–Control) and the neutral grounding resistor system (Post–Glover). And, even in those cases, Mr. Lin asserts that he personally took over the design work. He did so even though, as he testified, he knew little about designing either component.

Because Mr. Lin assumed responsibility for nearly all of the work under the contract, it is not surprising that he had difficulty making adequate progress. Moreover, it is completely understandable why he had substantial difficulty just keeping up with his required submittals under the contract. Unfortunately, understandable does not equal excusable. The contract required forty-six (46) separate types of submittals. Thirty-six (36) of those submittals require government approval. While the government is entitled to forty-five (45) days to review each submittal that requires its approval, here, the government provided an average response time of approximately 26 days.[44] Between December 9, 1998 and February 2, 2000, Mr. Lin had received unrestricted approval of a mere five (5) required submittals. The expedited turnaround of his submittal reviews does not appear to have helped Mr. Lin's progress with respect to submittal work.

As for the competency of his staff, Mr. Lin made numerous attempts to hire qualified technical workers. When faced with the impending default termination, he agreed to get subcontracting/staffing commitments, in writing. He failed, however, to do so; instead, his subcontracting plan set forth only companies that "could" consult on the project "as needed." The notable exception was his June 16, 2000 hire of Donn Rosen, a Professional Engineer that Mr. Lin asserted met the contract's experience requirements for the neutral grounding protective relaying scheme. After his default termination, Mr. Lin sent a letter to Mr. Fedynski in an effort to convince him to reconsider the termination. In his letter, Mr. Lin "transcribed" a series of conversations that he had with David Wong (Contracting Officer's Representative). The exchanges he recounted, as shown below, are particularly instructive:

*June 14, 2000 conversation between Messrs. Lin and Wong*

**Lin:** I called Roy Electric in the Soo. I talked to Mr. Rick Roy. When GE was rewinding the generator, their people installed the conduit and control cables. They wanted $60 an hour.

**Wong:** You know that George wanted a written commitment as said in his email.

**Lin:** I know.

*June 19, 2000 conversation between Messrs. Lin and Wong:*

**Wong:** I wrote in my conversation record for the last phone call that [you] would hire Roy Electric.

**Lin:** Well, they wanted $60 an hour where I could hire someone at the Davis–Bacon rate around $25 or $28 (an hour).

**Wong:** You know you need to have a written commitment for your resources

43. Mr. Lin's testimony at trial established that he made repeated efforts to hire personnel, but was unsuccessful. *See, e.g.,* Tr. at 188–197. Further supporting the conclusion that Mr. Lin's hiring efforts were unsuccessful are his various CQC Plans, which reflect no employees other than Mr. Lin himself. PX 35, 80, 324. At trial, the court asked Mr. Lin how many workers he had in 1998

and 1999, to which he admitted he had none, other than himself. Tr. at 1404–1405.

44. Average response time cited is based on the response times for submittals reviewed prior to February 2, 2000.

Lin: Facing a termination, I would certainly do anything to save my skin...

PX 338.

Mr. Lin, by his own account, "would certainly do anything to save [his][ ] skin,", except, we note, pay qualified workers a penny more than he was legally obligated to pay. *Id.* His failure to secure a written commitment for subcontracting, as he was instructed to do as an express condition to prevent termination, was the final straw for Mr. Fedynski. Rather than provide a subcontracting plan with written commitments from qualified workers and/or companies, he opted to provide the number of electricians listed in the local yellow pages, and stated that he talked to companies that he claimed would be willing to work with him if called upon. In light of Mr. Fedynski's experiences with Mr. Lin regarding his pre-award representations regarding his intent to hire qualified staff, the court is not surprised that Mr. Lin's purported subcontracting plan failed to allay Mr. Fedynski's concerns.

Failure to hire staff also led to quality problems. While we further address issues of workmanship in the next section, we note here that Mr. Lin not only did all of the work for at least thirteen (13) of the eighteen and one-half (18–1/2) months of performance, but he also was his own Quality Control Manager, Mechanical Specialist for Quality Control, Electrical Specialist for Quality Control, Submittal Clerk Specialist for Quality Control, et cetera.[45] It is no wonder, then, that the government observed significant problems with the overall quality of his workmanship.[46] Attempting to complete designs, installation plans, construction, and submittal requirements, all while accepting full responsibility for monitoring quality control, is simply more work than one person can do well. No matter how much effort one expends, or how fervently he devotes himself to his work,

there are limits to what one man can achieve when faced with a $1,225,110.00 contract to automate five generating units.

In substance, we find, on this record, that plaintiff failed to diligently prosecute the work under the contract, though not for lack of dedication. Rather, we find that Mr. Lin's attempt to do almost everything by himself (or with a bare minimum of staffing assistance) prevented him from timely prosecuting the work.

Because we also found, *supra*, that (i) approximately 68% of the work remained to be completed under the contract at the termination date, and, at best, a mere 23.33% of the construction time remained, (ii) Aptus experienced significant difficulties with subcontractors, and (iii) Mr. Lin was unable to conform to the scheduling representations he made, the contracting officer was justifiably insecure with respect to Aptus' ability to timely complete the contract. Thus, we turn to the question of whether such delay is excusable based on government delays regarding the GFE.

### v. Excusable delay

A contractor who is terminated for default, pursuant to FAR § 52.249–10, is entitled to a conversion of its default termination into one for the convenience of the government if the contractor can establish excusable delay. In the context of a construction contract, as here, "the contractor must demonstrate that the excusable event caused a delay to the overall completion of the contract, *i.e.*, that the delay affected activities on the critical path." *Morganti*, 49 Fed.Cl. at 132 (citations omitted). Furthermore, the contractor must establish proof of excusable delay by a preponderance of the evidence. *Id.*

---

**45.** Both PX 35 and 80 (CQC Plans dated January 11, 1999, and August 19, 1999, respectively) name Mr. Lin as the party responsible for each of the listed job titles.

**46.** While Mr. Lin minimized the quality problems cited by the government when he authored his response, he acknowledged the factual findings with respect to several of them, *e.g.*, PX 276 (acknowledged using ½" rigid metal conduit al-

though ¾" is "the minimum size permitted under the contract"), and admitted fault with respect to several others, *Id.* (thanking the HDC inspector for pointing out that he forgot to remove a shipping plate from a component that he had installed). The workmanship issues are developed in greater detail as part of our analysis of Violations of Contract Requirements, *infra.*

The critical path is defined as work which *must* be done before other tasks may proceed (*e.g.*, the flooring must be completed prior to carpeting). "[I]tems of work that are given no leeway and must be performed on schedule...[*or*] *the entire project will be delayed* ...are on the 'critical path.'" *Mega Constr. Co. v. United States*, 25 Cl.Ct. 735, 746 (1992) (quoting *Haney v. United States*, 230 Ct.Cl. 148, 676 F.2d 584, 595 (1982)) (emphasis added). Stated differently, the delay must not simply inconvenience the contractor by requiring him to shuffle the order of the tasks to be performed; it must effectively prevent *all progress* under the contract until the delay is resolved. *Id.*

Before we begin our analysis of the relevant evidence, we note again that Mr. Lin failed to present his case in the most effective manner; he was the only witness who asserted that government delay interfered with his ability to make progress. His testimony is, of course, somewhat tainted by its self-serving nature. Moreover, we held, *supra*, that the representations Mr. Lin made regarding his staffing plans during the pre-award stage and shortly after the award could not justify default termination, even if they were fraudulent. This holding, however, did not vitiate the allegations of fraud; rather, we determined that the government had waived its right to allege fraud with respect to those statements at this posture. In short, we did not decide the ultimate issue of fraud, because we did not need to.

Mr. Lin avers that the government caused him to suffer delayed progress. He bases this claim on his assertion that the GFE was seriously delayed, and when the governor and excitation equipment did arrive, parts were missing and/or defective. As we explained, *supra*, we limit our analysis of delay to such delay that (i) affected the non-SCADA portions of the contract, and (ii) occurred after the execution of the November 24, 1999 contract modification. To recapitulate our rationale for this limitation on evidence of

delay, we find that Mr. Lin agreed to complete the work remaining under the contract by July 31, 2000. He did so despite the unavailability of a SCADA delivery date. Further, the modification expressly noted that Aptus was accepting the 150–day extension as compensation for governor and excitation delays. Additionally, we find that the contracting officer did not base any portion of his termination decision on the noncompletion of the SCADA installation. Indeed, he could not have, because the SCADA equipment had not been delivered as of the termination date. Consequently, we hold that the parties intended to establish July 31, 2000 as the substantial completion date for all non-SCADA work, Mr. Lin's current contentions to the contrary notwithstanding.[47]

Framing the issue in that light, we look only to the evidence that the governor and excitation equipment was in some manner delayed or discovered to be defective after November 24, 2000. The record reflects that Mr. Lin did find some defects in the Voith and ABB supplied equipment, which he brought to the attention of the contracting staff immediately. First, Mr. Lin notes that a pedestal for Unit 10's governor control panel was missing. In his fax to Contracting Officer's Representative James Peach, he notes that "[w]ithout it, no conduit or wiring can proceed further [at Unit 10]." PX 102. We cannot accept that this was a critical path item such as to excuse delayed progress. This is so because Mr. Lin had ample design work that was able to be completed without reference to the GFE. For example, he had yet to turn his attention to the neutral grounding protective relay scheme, and his submittal of the revised neutral grounding resistor system was disapproved the very day he discovered and reported the missing part. He resubmitted a revised neutral grounding resistor system on February 4, 2000, thus indicating that he was able to occupy his time, absent the GFE. That submittal was reviewed and returned to Mr. Lin

47. Note that we might have reached a different conclusion if we found any evidence in the record that a SCADA delivery date had been presented to Mr. Lin prior to, or contemporaneously with, the execution of the modification. If there

was evidentiary support for that notion, we might determine that Mr. Lin relied on said SCADA delivery date when he negotiated his extension.

on March 3, 2000, and a resubmittal was again required.

In addition, Mr. Lin represented to the government on February 23, 2000, that he "believes that the dates of his latest proposed schedule are still achievable." PX 127 at 1. At that time, Aptus' "Transmittal 1.5—Construction Schedule" was the schedule to which he referred. As reflected in the table provided in subsection III.B.1.i., *supra*, that schedule represented that all work (less SCADA) would be complete before the July 31, 2000 deadline. The single exception was the Unit 10 exciter, which was scheduled for completion on August 5, 2000. Mr. Lin did not prepare that schedule until February 4, 2000—after this defect was discovered. He cannot therefore establish that defective or missing parts relating to a single generating unit interfered with the critical path, when his own statements conflict with that claim.

The next alleged problem with the GFE was discovered by Mr. Lin on February 24, 2000. There, Mr. Lin provided a laundry list of missing and defective parts relating to governor equipment. We cannot concur with Mr. Lin's bare conclusory assertions that these problems impeded critical path work either, because we find that Mr. Lin had copious work to complete before installation itself became a critical path item. Most notably, Mr. Lin's February 10, 2000 submittal register showed that Aptus had six separate submittal types currently "in design." Said register designated that these designs would be submitted by May 10, 2000. Four of those submittal types required drawings. There is no indication the GFE problems noted by Aptus on February 24, 2000 hindered these design submittals. Further supporting this finding is a June 9, 2000 email communication circulated among members of the contracting staff entitled "Notes for Aptus Conversations," wherein the government stated that:

> Please help Aptus to understand: . . .
>
> [D]esigns and submittals must move quickly. This is the "critical path". . . . Physical installation itself will not have critical path importance until actual outages begin. . . . Submittals required prior to the first outage are incomplete.

That means we have at least 45 days before the first outage. Wire and conduit work can't begin until the wire and conduit submittals are approved. Therefore, even some of the preliminary installation work can't begin. Until installation becomes a critical path item, delays caused by Voith equipment have no impact on the contract schedule.

PX 173 (emphasis in original).

We find the above statement extremely persuasive, especially in light of our earlier findings regarding the percentage of work remaining under the contract at the time of termination (68%). The majority of the work under the contract was outstanding at the time of default termination, and the required installation procedure submittals had not been provided to the government as of June 2000. Since GFE installation could not begin until at least July 15, 2000 (based on the 45–day submittal review period), we cannot subscribe to the contention that Aptus' delays resulted from defects to GFE. We find that Aptus could perform ample work, even in the absence of GFE. For example, Mr. Lin could complete the numerous designs that he identified as still "in design" (or to be designed) as late as his June 19, 2000 Construction Schedule, namely designs for: the Neutral Grounding System, the Unit 10 Switchboard, and the Unit 10 Switchgear. Thus, we hold that Aptus has not established an excuse for his lack of progress. And, in accordance with our earlier findings, we hold that the contracting officer's decision to terminate Aptus for default was based on a justifiable insecurity regarding Aptus' ability to timely complete the contract.

Accordingly, we uphold the default termination, and therefore DENY plaintiff's claim of wrongful termination.

### c. Violations of Contract Requirements

The government cites Aptus' violations of contract requirements as an alternative ground to uphold the default termination. Specifically, the government cites significant violations of submittal requirements, and failure to follow technical requirements, resulting in unacceptable work. Additionally, defendant cites Aptus' violations of contract

staffing requirements. Although we have already determined that the default termination was proper, we shall briefly address these issues as well.

First, we turn to the submittal requirements, which have already received a fair amount of attention in earlier sections. The evidence presented to this court reflects that Mr. Lin was required to make forty-six (46) separate enumerated submittals. The contract contains numerous lists of required submittals, along with descriptions of what each submittal is to contain. *E.g.,* PX 212(1) 187, para. 1.3; PX 212(1) 114–124, para. 3.2.2. Moreover, the contract sets numerous specific deadlines for the proffering of certain submittals. *Id.* For instance, the contract contains a Submittal Register (ENG FORM 4288) that lists each of the forty-six (46) submittals, and directs the reader to the specific paragraph in the contract that describes the submittal. PX 212(1) at 152. Said Submittal Register shall be submitted "to the Contracting Officer for approval within 10 calendar days after receipt of the Notice to Proceed." PX 212(1) at 110. The contracting staff made Mr. Lin aware of this requirement when, as of February 23, 1999, he had failed to submit his register. PX 45. The government explained to Mr. Lin that the submittal register is an important tool by which the government monitors progress. By his own account, Mr. Lin submitted his first attempt at a submittal register almost a year later, on February 10, 2000.

Administrative submittals, such as the register, employee lists, scaffolding submittals, etc., are of lesser import, in our view, than are technical submittals and product submittals. Nonetheless, they are each required by the contract that Mr. Lin entered into voluntarily. Individually, we do not find that failing to comply with isolated submittal requirements constitutes a material breach of the contract that justifies default termination. However, the evidence shows that Mr. Lin's failure to comply with submittal requirements was systemic. Further, submittals of far greater importance were never provided. For example, the government never received a completed design for the Neutral Grounding System, although the system could not be manufactured without prior design approval. That single submittal prevented Mr. Lin from performing his manufacturing and installation requirements relating to the neutral grounding system. The neutral grounding system was the single largest contract line item.

In addition, Aptus failed to receive approval prior to making purchases. This practice led to Aptus making a number of unilateral changes to the specifications, which plaintiff does not deny. For instance, Mr. Lin simply decided not to comply with a known contract requirement specifying the use of ¾" rigid metal conduit. He stated that cost difference between ½" conduit and ¾" conduit is minimal (indicating that he was not disregarding the specifications out of personal financial considerations). Using ¾", "the minimum size permitted under the contract, may not result in an optimal routing and achieve maximum installation prior to the generator shutdown." PX 327 at 12. The government, as is its right, refused to accept the work. Mr. Lin made another unilateral change to the contract requirements when he used a roller-type cutter on conduit, although such cutters were expressly prohibited in the contract. He acknowledged that he was aware of the requirement, but defended his use thereof stating "[i]f the roller type cutter is not suitable for the conduit, its (sic) hard to imagine why the RIGID, the world leader in the threader business, is still shipping it as a standard equipment without fear of liability damage claims." PX 276 at 30. We find that comment, and others like it, to be a completely inappropriate response. A combative tone is especially unwarranted when the government is simply requiring that the contractor do the job that he freely assumed, in accordance with the terms to which he agreed.

Other workmanship issues arose throughout the course of performance. When informed that he had committed a violation of the National Electric Code, Mr. Lin wrote:

By no mean (sic) do I despise NEC code, but a product design is way beyond the code compliance. The lifeless code does not design a product, but an engineer's creativity, keen observation, and superior

problem solving technique do. You may be able to throw a code book on me like a Pharisees, but I'll have a better end product after smoothing out a few rough edges. *Id.* at 35.

We simply cannot fathom why Mr. Lin feels that he is justified in violating the government's specifications *and* the NEC. Arguing that he knows better than the government and the NEC, and attacking both the Code and the inspector who noted the problem, does not justify his inflexible position.

In addition to submittal issues and nonconforming workmanship, the government cites failure to follow the staffing requirements set forth in the contract. This is most evident with respect to the CQC plan and submittal. PX 35; PX 324. To provide some background, the contract places the burden of controlling quality on the contractor. The government's role is simply to assure itself that the contractor is, in fact, executing his CQC Plan. As discussed relevant to accusations of contractor fraud, *supra*, the contract sets specific experience requirements for persons filling the required supervisory quality control roles. For example, a mechanical specialist and an electrical specialist are expressly required. Both have to be either graduate (mechanical/electrical) engineers with two years experience, or persons with five years of related experience. Mr. Lin failed to comply with the mechanical portion of the contract, despite his assertions to the contrary. Moreover, this same section required a CQC System Manager, "who shall be a *construction* person with a minimum of three years in *related work.*" PX 212(1) at 117 (emphasis added). We find that the plain meaning of the phrase "related work" requires that the CQC System Manager's work experience shall be related to hydroelectric power plant construction. Mr. Lin had no prior hydroelectric power plant experience, by his own admission.

Without parading out every single alleged violation of the contract requirements, we find that (i) Mr. Lin committed numerous contract violations, (ii) he did so without regard for his obligations under the contract's express terms, and (iii) taken in totality, these violations constitute material breach of the contract. Thus, we hold that the contracting officer's decision to terminate Mr. Lin was justified on this basis.

#### d. Violations of the Davis–Bacon Act

The government asserts that the termination may also be upheld based upon alleged violations of the Davis–Bacon Act. In support of this allegation, the government argues that Aptus "ignored repeated requests to comply" with the Act. PX 263. Further, the government avers that Mr. Lin intentionally manipulated the number of hours that he reported for his workers, thereby giving the false impression that they were being paid in compliance with the contract's wage determination.

Plaintiff, conversely, argues that the contract incorporated FAR § 52.222–14, which requires that labor disputes be resolved in accordance with the Department of Labor regulations set forth in 29 C.F.R. parts 5, 6, and 7 "and not the Disputes clause of this contract." FAR § 52.222–14. We concur with plaintiff's reading of the law insofar as the dispute complained of herein is premised upon violations of the Davis–Bacon Act that are not justiciable before this court. *Herman B. Taylor Constr. Co. v. Barram,* 203 F.3d 808 (Fed.Cir.2000).

In our view, however, defendant's allegation regarding the falsification of payroll documents is not a "Labor Dispute." It is a labor reporting deficiency and, if true, is a violation of the Payrolls and Basic Records Clause, FAR § 52.222–8, not just the Davis–Bacon Act. *Kelso v. Kirk Bros. Mech. Contractors, Inc.,* 16 F.3d 1173 (Fed.Cir.1994). To clarify, on one hand, defendant raises the allegation that plaintiff violated the wage determinations by failing to pay his workers in accordance to the wages set therein (Davis–Bacon Act Violation). On the other hand, the government proffers evidence that Mr. Lin falsified payroll information to cover up his Davis–Bacon Act violations. The former must be determined by the Department of Labor; the latter is cognizable here. Thus, if there is evidence to substantiate violations of the Payrolls clause, defendant has an independent ground upon which to justify the termination for default.

Upon review of the record, we find a dearth of evidence to support a charge of payroll violations. There *is* evidence that Mr. Peach (Contracting Officer's Representative) conducted an informal wage interview that indicated that Mr. Lin might have under-reported hours. Mr. Peach is reported as saying that he checked some of the payroll submissions against the Soo sign-in logs at the guard station, yet no such log entries were presented to the court. No payroll submissions are a part of the record before us. No such wage interviews were included for our evaluation. All we have are vague rumblings about what the contents of evidence that is not before us might have established, had it been presented. That is simply not enough for us to assign a charge involving moral turpitude to Mr. Lin's actions.

Thus, we hold that the government has failed to meet its burden of proof with respect to this issue, and therefore cannot justify the default termination on this basis.

### B. Count III—Government Changes to Contract

In Count III of Plaintiff's First Amended Petition, plaintiff avers that the "Government conspired and ultimately succeeded in the misuse of *Default* clause to change the manner of contract performance." Compl. 9. A careful reading of this claim reveals that Mr. Lin believes that the government denied him the services of erecting engineers, in violation of the contract. We find no evidence of that in the record. Further, we note two pertinent facts: (i) Mr. Lin did receive a visit from Voith erecting engineers in response to his February 24, 2000 complaints of governor defects, and (ii) a contract prerequisite for receiving assistance from the erecting engineers is that Mr. Lin request said services, via Submittal Item 32, thirty (30) days in advance of his need for the erecting engineers' services. We see no evidence in the record that Mr. Lin ever made such a request. Additionally, based on our evaluation of the progress of the work at the time of the termination, assistance from erecting engineers would have been premature. As we noted, *supra*, Mr. Lin had not received approval to begin installing GFE at the time of the termination, as he had not submitted his installation plans for approval. Thus, we find no valid basis for plaintiff's claim that the government breached its obligations under the contract by withholding the services of erecting engineers.

Plaintiff's claim for changes to the contract is DENIED.

### VI. CONCLUSION

For all of the foregoing reasons, the court rules as follows:

1. Plaintiff's claim for wrongful termination (Count I, including Counts II and V subsumed thereunder) is DENIED;

2. Plaintiff's claim for changes to the contract (Count III) is also DENIED;

3. Plaintiff's claim seeking damages for violations of suretyship law (Count IV) is DISMISSED pursuant to RCFC 12(b)(1); and

4. Finally, Defendant's Motion for Entry of Judgment pursuant to RCFC 52(c) is MOOTED by this opinion; therefore it is DENIED.

The Clerk of the Court is directed to enter judgment accordingly, dismissing plaintiff's complaint in its entirety.

IT IS SO ORDERED.