ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Bulova Technologies Ordnance Systems LLC ) ASBCA No. 57406
)
Under Contract No. W91CRB-09-C-0014 )

APPEARANCES FOR THE APPELLANT: Eric R. Pellenbarg, Esq.
Phelps Dunbar LLP
Tampa, FL

Craig Schnee, Esq.
General Counsel

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
Army Chief Trial Attorney
MAJ Samuel E. Gregory, JA
Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE GRANT

Appellant Bulova Technologies Ordnance Systems LLC (Bulova) appeals the government's decision to terminate its contract for default. The government contends the termination for default was justified because Bulova failed to make timely deliveries under the contract, and anticipatorily repudiated the contract. Bulova asserts that it was not in default and did not repudiate the contract, and that therefore the termination should be converted to a termination for convenience. We have jurisdiction under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109. For the reasons stated below, the appeal is denied in part and sustained in part.

## FINDINGS OF FACT

*The Contract*

1. On 13 January 2009, the U.S. Army Research, Development and Engineering Command awarded Contract No. W91CRB-09-C-0014 to Bulova. The firm fixed-priced contract contained five contract line item numbers (CLINs) and 21 sub-CLINs for delivery of various types and quantities of weapons, as foreign military sales (FMS) to

the government of Iraq. As awarded, the contract was valued at $30,213,134.[1] (Gov't Proposed Findings of Fact (PFF) 1; app. br. at 3) This contract supported two FMS "cases" (tr. 1/163). Delivery was FOB destination with the contract specifying delivery under CLINs 0001-0004 to the Iraqi Ministry of Defense (the army), Taji National Depot Central Receiving, Taji, Iraq; and CLIN 0005 to the Iraq Ministry of Interior (the police), Baghdad Police College, Baghdad, Iraq (PFF 2; app. br. at 3; tr. 1/275).

2. The contract set the delivery date for each sub-CLIN as a certain number of days after receipt of an End Use Certificate (EUC) (R4, tab 1 at 16-20; tr. 1/107-08). An EUC is a document created by an importing country and supplied to the exporting country to confirm that the materials listed on the EUC – weapons in this case – are for the use of the importing country and that the importing country will not resell them or re-issue them to another country (tr. 1/161). The EUC thus facilitates the supplier getting an export license from the country supplying the weapons (tr. 1/26, 29, 102, 276-77, 332). The U.S. government, through the U.S. Army Security Assistance Command (USASAC), was responsible for obtaining EUCs from the Iraqi authorities; the U.S. government security assistance office in Iraq would then send the EUCs to the contracting officer (CO), who would then send them to the respective exporting manufacturers (tr. 1/36, 159).[2] The USASAC representative acted as the CO's representative (COR) on the contract (tr. 1/162).

3. This dispute concerns three different weapons and related parts from three different subcontractors, in three different countries:

-- PSL sniper rifles with scope/parts (from Romania, subcontractor RomArm):

- CLIN 0004AF for 30 rifles with scope (all due 90 days "after EUC").

- CLIN 0004AJ for 30 spotter scopes for the PSL rifles (all due 90 days "after EUC").

- CLIN 0005AB for 3,134 rifles with scope (970 rifles due 90 days "after EUC" and 2,164 rifles for delivery 210 days "after EUC").

(R4, tab 1 at 11-12, 14, 19-20)

---

[1] The contract value was reduced to $26,794,334 on 26 February 2009 due to the termination for convenience of CLIN 0005AC for 500 82mm mortars, unrelated to the other requirements and not at issue here (R4, tab 2 at 1, 2; tr. 1/116, 118, 308).

[2] There is conflicting evidence as to whether the process was for the EUCs to be sent by the CO to the exporting country (tr. 1/203), the exporting country subcontractors (app. supp. R4, tab F; tr. 1/291), or the prime contractor (tr. 1/36), but resolving this conflict is not essential in resolving this dispute.

2

-- NSV heavy machine guns with mounts/parts (from Serbia, subcontractor Yugoimport[3]), all due 270 days "after EUC":

- CLIN 0001AA for 15 heavy machine guns.

- CLIN 0002AA for 26 heavy machine guns.

- CLIN 0003AA for 26 heavy machine guns.

- CLIN 0004AC for 27 heavy machine guns.

(R4, tab 1 at 1-2, 4, 6, 9, 16-19)

-- PKM medium machine guns with mounts/parts (from Bulgaria, subcontractor Arsenal):

- CLINs 0001AC-0003AC; 0004AE for a total of 220 medium machine guns (due 60 days "after EUC").

- CLIN 0005AA for 9,000 medium machine guns (due in specified increments, with delivery due dates from 60-360 days "after EUC").

(R4, tab 1 at 3, 5, 7, 10, 13, 16-20) These weapons were unrelated to each other, and were distinct, stand-alone products (tr. 1/116). The parties have clarified that the other weapons covered by the contract (light machine guns, mortars, and launchers)[4] were delivered and paid for and that there is no dispute as to contract performance of these specific items (gov't letter dated 18 December 2013; app. letter dated 19 December 2013).

4. The solicitation for these requirements originally had fixed delivery dates, but at Bulova's request in its proposal, the dates were changed to be a designated period of time after receipt of the EUC. This would reduce Bulova's performance risk by not making Bulova responsible for any delays the government might encounter in getting the EUCs. (Tr. 1/277-79, 288-89)

5. On 26 February 2009, the government issued unilateral Modification No. P00001 (Mod. 1) to the contract, adding FAR clause 52.232-32, PERFORMANCE-BASED PAYMENTS (JAN 2008), a milestone schedule, and deleting CLIN 0005AC for 82mm mortars (R4, tab 2).

---

[3] The subcontractor (in-country distributor) was Yugoimport; the actual manufacturer was Zastava Arms (R4, tab 1 at 15, tab 127 at 3).

[4] Light machine guns, CLINs 0001AB, 0002AB, 0003AB, 0004AD; mortars, mortar bases/bipods, and sight units, CLINs 0004AA, 0004AB, 0004AH; launchers, CLIN 0004AG (R4, tab 1 at 3, 5, 7-12).

The Performance-Based Payments clause and milestone schedule were added at Bulova's request (R4, tab 11). The first milestone for each item was linked to receipt by the government of copies of Bulova's subcontracts; the second was linked to receipt of acceptable government inspection reports for various shipment increments/sub-CLINs (R4, tab 2 at 8-9). Bulova submitted various invoices for performance-based payments over the life of the contract, resulting in total payment of approximately $23.6 million (PFF 4; app. br. at 4).

6. The contract contained FAR clause 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984). This clause stated, among other things, that the government could terminate the contract for default "in whole or in part if the Contractor fails to – (i) Deliver the supplies…within the time specified" in the contract, or fails (after notice and opportunity to cure) to make progress so as to endanger performance of the contract. FAR 52.249-8(a)(1). (R4, tab 1 at 48) The contract also contained FAR clause 52.233-1, DISPUTES (JUL 2002). This clause stated, among other things, that the contractor "shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract...." FAR 52.233-1(i). (R4, tab 1 at 47)

*Initial Issues with the EUCs*

7. On 12 February 2009, augmenting what Bulova had included earlier in its proposal, Bulova provided the government with templates for the EUCs to be used for Bulgaria, Romania, and Serbia. These templates were prepared based on information obtained from the manufacturers in those countries.[5] The templates for both Romania and Serbia specified, among other things, signature and seal or raised stamp.[6] (App. supp. R4, tabs A, B, C; tr. 1/285, 288)

8. Apparently having heard nothing from the government for two months with regard to the EUCs, Bulova asked the government on 14 April 2009 for an update as to their status. Bulova explained that once acceptable EUCs were received, it could take about 30 days to obtain the necessary export licenses. (App. supp. R4, tab D)

9. On 20 May 2009, the CO notified Bulova that she had the EUCs (R4, tabs 34-38). She shipped the EUCs to Yugoimport (Serbia) and Arsenal (Bulgaria) on 22 May 2009, providing tracking numbers for those locations (R4, tab 39). RomArm apparently received its EUC on 24 July 2009 (R4, tabs 46, 48). The EUCs did not conform to the format Bulova had provided (tr. 1/111, 118, 199-201, 291-93, 300-01, 304).

---

[5] There is no copy of the EUC template for Bulgaria in the record; however, documentation shows it was being forwarded at the same time and this issue is not contested (app. supp. R4, tabs B, C).

[6] The terms "seal" and "stamp" are used synonymously (tr. 1/335).

10. Right away, both Serbia and Bulgaria had issues with the EUC format. Serbia found its EUC unacceptable because it did not have a seal and a date; Bulova advised the CO of this on 5 June 2009 (app. supp. R4, tab G). With regard to Bulgaria, Arsenal noted that the wrong official had signed (Iraqi Minister of Defense instead of Iraqi Minister of the Interior); Bulova advised the CO of this on 9 June 2009 (R4, tab 230, dep. ex. 4; app. supp. R4, tab F at 4). The Bulgaria EUC was also missing a date and seal (tr. 1/292-93). The EUC for Romania also was missing a date and seal, but at this point neither party had received objections from either Romania or RomArm (*see* finding 16). Bulova decided to "lay low" with regard to the Romania EUC, primarily because of the need to focus first on the other contract items (tr. 1/301-03, 2/13).

11. As to the defective EUCs, Bulova thought it made more sense to try to work the EUC problems with the countries in question to avoid the delays likely in getting the EUCs re-issued by Iraq. Bulova advised the CO who did not voice any objections to this approach. (App. supp. R4, tab L; R4, tab 44; tr. 1/293-97, 301-03) With regard to Bulgaria, Bulova asked for help from the U.S. Embassy in Bulgaria on 18 June 2009. That same day, Bulova and the government representatives were informed by the point of contact at the U.S. Embassy that "everything should be fine with this EUC as long as it is accompanied by a memo from the US Embassy." However, Bulova was told there was no "100% assurance," and was instructed for the future to "attempt to ensure your EUC has the proper seals and signatures." (R4, tabs 44, 197) With regard to the Serbia EUC, the record is conflicting as to whether Bulova had returned it to the U.S. government in June 2009 or not (R4, tab 100 at 2, tab 198 at 2; complaint and answer ¶ 12; app. supp. R4, tab O).

12. On 30 July 2009, the CO provided an authentication letter to help validate the three EUCs. This authentication letter was addressed "To Whom It May Concern" and was not specific to the country, weapon, or manufacturer. Apparently the letter went to Serbia as well as Bulgaria (R4, tab 53; tr. 2/20-21, 51). Shipments of some contract items were made in August-September 2009 time frame from Bulgaria (tr. 1/299, 2/41, 50; R4, tab 91).

13. Problems continued with the EUCs into the fall of 2009. With regard to Bulgaria, on 19 October 2009, as part of an updated delivery schedule, Bulova advised the government that Bulgaria was still awaiting a correct EUC (R4, tab 61 at 3). With regard to Serbia, Yugoimport advised Bulova on 21 October 2009 that the weapons would soon be ready to ship, but there was still no corrected EUC as required (app. supp. R4, tab O). Bulova notified the government (USASAC and the CO) on 22 October 2009 that Serbia would not accept the EUC despite authentication, and asked if the EUC should be returned (R4, tab 58 at 22).

14. The USASAC representative replied, copying the CO, that "if the exporting countries will not accept [the EUCs] please formally notify the Contracting Officer." She

explained that she would like to address all three EUCs at the same time. (R4, tab 58 at 16, 18, 22) Her reply did not state that she required a formal rejection by the foreign government and return of the defective EUC. In her testimony at trial, the USASAC representative stated she repeatedly asked for EUCs to be returned (tr. 1/174, 178, 182), but the documents do not support this recollection. Additionally, Bulova representatives testified they were never asked for return of any EUC in 2009 (tr. 1/303, 2/13, 27-28, 135-36). In early November 2009, Bulova again advised the government of problems with the Serbia EUC in a status report, noting that Yugoimport could not process the EUC because it was not signed and dated, and adding that "we are attempting to finesse through US Embassy" (R4, tab 203 at 4-5). The government quality assurance representative also inspected some NSV heavy machine guns in December 2009 and noted that a valid Serbia EUC was still needed for those shipments (R4, tab 130 at 2; tr. 1/246).

15. Also in the fall of 2009, and unrelated to the EUC issue, Bulova submitted a request for equitable adjustment (REA) for $82,824, due to "Force Majeure," in particular, unexpected landing fees at Baghdad International Airport (BIA). Bulova explained that the U.S. government had turned over control of BIA to the Iraqi authorities in August 2009, who in turn gave a contract to RUS Aviation to run the airport. RUS Aviation imposed a $10,000 security fee when landing a flight, for which Bulova wanted payment. (R4, tab 58 at 1, 3, tab 77) The government denied Bulova's REA on 15 January 2010, stating that the U.S. government's action was a sovereign act which would not warrant compensation (R4, tab 66). Bulova disagreed with this view, considering the airport turnover to be a contractual act by the U.S. government (R4, tab 68).

16. Apparently Bulova first heard from RomArm officials of the unacceptability of the Romania EUC in January 2010, at an international weapons show in Las Vegas, Nevada, when Bulova and RomArm officials met to discuss the subcontract. Bulova reported this to the CO on 25 January 2010. (R4, tab 67; tr. 2/19, 128-29) On 2 March 2010, Bulova again reported an EUC issue with Romania, noting that the EUC needed authentication (R4, tab 77 at 2). Also on 2 March 2010, Bulova reported that Yugoimport was asking for an authentication letter in an effort to try to get Serbia to accept that EUC (R4, tab 77 at 1, 3).

17. By the spring of 2010, the status of production and payment of the weapons was as follows:

-- NSV heavy machine guns from Serbia:

> All 94 had been manufactured (by 8 December 2009);
> awaiting payment from Bulova and a valid EUC (R4,
> tab 130).

-- PSL sniper rifles from Romania:

> Raw materials and tooling bought as of April 2010; no
> production started. Awaiting payment from Bulova and EUC
> authentication. (Tr. 1/243; R4, tab 77 at 2)

-- PKM medium machine guns from Bulgaria:

> As of early March, 4,500 still to be delivered; 3,000
> manufactured but not shipped (R4, tab 67 at 2, tab 78 at 2).
> EUC still an issue (R4, tab 82).

*Cure Notices and EUC Authentication/Reissuance*

18. Resolution of the EUC issue appeared promising in late March 2010, when Bulova advised the CO on 26 March 2010 that all three countries had indicated they would accept the EUCs if the CO sent a letter documenting their authenticity (R4, tab 90 at 2). However, on the same day, the CO issued a cure notice to Bulova indicating that weapons from all three countries were late, based on an EUC-receipt date of 22 May 2009. The CO took the position that the EUCs were valid despite the omissions because of successful deliveries from Bulgaria in September 2009, and because Bulova had never returned to the CO any defective EUCs with a letter from the government in question rejecting them. Among other things, the CO asked Bulova to explain what steps it would take to deliver the weapons and state when delivery would be made. (R4, tab 91) Bulova representatives testified this was the first time return of the EUCs was mentioned (tr. 2/53, 135-36).

19. Bulova responded to the cure notice on 9 April 2010, stating that performance was not due because delivery dates were triggered by receipt of acceptable EUCs, which the government had not yet provided. Bulova explained that successful shipments from Bulgaria in September were a "fortunate anomaly," the one-time occurrence of which was independent from the validity of the three EUCs for the three countries involved. Bulova outlined its continued efforts to work with its suppliers, and asserted it was not responsible for the government's failure to provide acceptable EUCs, either initially or after Bulova's later request. (R4, tab 100)

20. The government considered the response to the cure notice to be inadequate, and issued a second cure notice on 26 April 2010. The CO asked for specific dates as to when the weapons would be shipped. Also, specific information was requested for each of the three countries: For Bulgaria, Bulova was asked to confirm that it had secured a loan to facilitate shipment; for Romania, Bulova was asked to confirm that shipment would occur once Romania received a letter of authentication; and for Serbia, Bulova was

7

asked to confirm that Serbia rejected the EUC and Bulova would be returning it to the CO. (R4, tab 107) On 27 April 2010, the CO asked Bulova to get a letter from the Serbian government formally rejecting the EUC, as Bulova's representations to that effect would not suffice (app. supp. R4, tab U).

21. Bulova provided an initial response to the second cure notice on 27 April 2010. Bulova reported that the return of the Serbia-rejected EUC was delayed due to the volcanic ash issue that cancelled thousands of flights from Europe, but the EUC had been shipped via overnight delivery several days earlier (issues with the correct address were noted). Bulova also stated that Bulgaria and Romania were still asking for EUC authentication letters. (R4, tab 109) On 4 May 2010, Bulova provided the CO with the Serbian letter rejecting the EUC and the translation by Yugoimport (app. supp. R4, tab W; R4, tab 116).

22. On 27 April 2010, the CO provided a letter of authentication for the Romania EUC (R4, tabs 111, 112); apparently one was also provided for Bulgaria (R4, tabs 123, 124; tr. 1/42-43). On 19 May 2010, Bulova advised the CO that both countries gave a "green light" to export the weapons based on the authentication letters (R4, tab 124); we find that this date (19 May 2010) constitutes receipt of an acceptable EUC for those two countries. As to Serbia, the U.S. government reported on 10 June 2010 that Iraq had signed, dated, and stamped the EUC for Serbia (R4, tab 135); USASAC received it by 21 June 2010 (R4, tab 152 at 2). On 14 July 2010, Bulova reported that they had received the EUC and sent it to Yugoimport but that it was still in transit (R4, tab 152). Although it is not clear when either Serbia or Yugoimport received it, we find 14 July 2010 to be the date of receipt of an acceptable EUC for Serbia.

*Modification, Show Cause/Cure Notice, and Termination*

23. On 2 June 2010, the government and Bulova executed Modification No. P0002 (Mod. 2) to the contract, which affected two of the three weapons and eliminated any reference to EUC receipt dates. Specifically, this modification established new delivery dates for the 4,500 remaining PKM medium machine guns from Bulgaria (CLIN 0005AA), with shipments due on 15, 18, 22 and 25 June 2010. Mod. 2 also established new delivery dates for the 3,134[7] PSL sniper rifles from Romaina (CLIN 0005AB), with shipments due on 25 and 30 August 2010 and 3 September 2010. The delivery dates for the NSV heavy machine guns remained unchanged. (R4, tab 3) Mod. 2 did not contain any monetary consideration for the adjusted due dates, but the CO testified that this modification did (in his view) extend the delivery dates, to try to achieve performance (tr. 1/113-14).

---

[7] Mod. 2 states that 3,164 were due, however the original contract quantity for CLIN 0005AB was 3,134, and the sum of the incremental deliveries in Mod. 2 is also 3,134 (R4, tab 1 at 14, tab 3).

8

24. Mod. 2 did not address the NSV heavy machine guns from Yugoimport of Serbia due to the emphasis the customer placed on the PKM medium machine guns and the PSL sniper rifles and the matter of re-issuing the EUC (tr. 1/50-51). Indeed, the CO wrote to the government quality assurance chief that "Serbia is not really Bulova's fault – the End User Certificate (EUC) was rejected and a new EUC needs to be completed by the Iraqi government" (R4, tab 219). The government anticipated issuing another modification to adjust delivery dates for these weapons due to the EUC issue (R4, tab 136).

25. On 14 June 2010, Bulova's manager emailed the CO that the BIA landing fee had increased to $25,000 per flight, and Bulova's logistics contractor would not ship without payment in advance, money Bulova did not have. He also reported that Bulova had received a large penalty fee from Serbia and that "the lack of EUC and product sitting to be moved has really got them upset." Bulova asked to meet as soon as possible to address these issues. (R4, tab 138)

26. The parties met on 16 June 2010. Bulova outlined its view of the contract delivery dates (after receipt of acceptable EUCs), and identified other cost impacts, such as landing fees at BIA ($80,000 for 2009), storage fees for NSV heavy machine guns awaiting the EUC (now at $60,000, based on $10,000 per month), and heat treatment of Serbian pallets initially required by the government and then abandoned ($62,000). Bulova said that it "remains committed to contract completion" and that weapons from Serbia and Bulgaria were packaged and ready to ship. (R4, tabs 139, 141, 142) As to funding, Bulova had applied for and expected to receive a loan, but also proposed that the government pay the remaining $3.5 million on the contract – these funds together would allow for contract completion (R4, tab 143; tr. 2/161). Bulova's manager testified as to the specifics of this approach, noting that the money could be paid directly to the subcontractors:

> "[W]ire Yugo Import $700,000 [for the NSVs], wire the balance of that [$3.5 million] to Bulgaria, which will deliver the bulk of what was needed to be delivered from Bulgaria, and my loan would clean up the balance of Bulgaria and all of Romania...."

(Tr. 2/162) This would enable delivery of 2,000 PKMs and 94 NSVs within 17 days of EUC receipt; PSL delivery would be made by 1 September 2010 (1,000) and 1 December 2010 (2,164) (R4, tab 142 at 10-11).

27. The day after the meeting, Bulova wrote the government stating that Bulova had initiated shipment of 500 PKM medium machine guns and expected those would arrive in Iraq by 2 July 2010. Bulova reported that due to the issues it complained of in the past, it was currently left "without sufficient funds to complete the contract," and

9

asked that the government release the $3.5 million unpaid "(and admittedly not yet due)," leading to delivery estimated by 9 July 2010 of the NSV heavy machine guns and 2,000 PKMs. Bulova stated that the PSL sniper rifles would not be ready until September 2010 (not due, in Bulova's view, until 19 November 2010), and that Bulova expected to "raise all the necessary funds privately" to pay RomArm. Bulova described this approach as "the best road to contract completion at the earliest possible dates," and concluded with a note to the CO that "we are very, very close to getting this job done." (R4, tab 143) Bulova's manager testified that "I had enough money coming in off the loan to [cover the landing fees and the heat treatment]," and whether Bulova later asserted a claim for those costs depended on whether the government released the rest of the contract funds (tr. 2/202).[8]

28. On 18 June 2010, the CO issued a show cause and cure notice to Bulova. The show cause part of the letter stated that the government was considering terminating for default the PSL sniper rifles and scopes (CLINs 0004AF, 0004AJ, and 0005AB) and gave Bulova the chance to present its plan to satisfy delivery of these weapons. The cure notice portion of the letter related to the NSV heavy machine guns and the PKM medium machine guns (CLINs 0001AA, 0002AA, 0003AA, 0004AC, 0005AA). The government asked Bulova to explain how it would "assure delivery" by the required dates. The letter stated that although the government might terminate the entire contract, it would consider treating the NSV and PKM portion separately, depending on Bulova's response to the cure notice. Among other things, the government asked for information on how the 89% of the funds paid Bulova had been spent, and a firm commitment as to when Bulova could deliver. (R4, tab 144)

29. Bulova responded to this letter on 28 June 2010. Bulova again stressed the impact that the lack of acceptable EUCs had had on performance. Bulova stated that it shared the government's goal of getting delivery of the weapons as soon as possible, and was raising "the required funds to complete the contract without your assistance and within the required delivery dates" as set forth in its presentation of 16 June 2010. Bulova explained it had spent the money received "in support of the program and general corporate support," and stated that both a price increase and a schedule extension was warranted because of government delays and actions. Bulova concluded by urging the government to consider releasing the remaining funds on the contract so delivery could be made as quickly as possible. (R4, tab 147 at 2-3)

---

[8] Bulova's manager also testified that Bulova was not "shipping another thing to Iraq without getting the shipping thing [landing fees] resolved" (tr. 2/153; *see also* tr. 2/35). However, this remark is tempered by the explanation about possibly pursuing a claim and other testimony and contemporaneous documentation as to proposed performance.

10

30. Bulova renewed its request on 6 July 2010, asking if the remaining money on the contract could be released to enable delivery of weapons awaiting shipment (R4, tab 149). Two weeks later, Bulova reported that it expected to secure its own funding by 15 September 2010, but again advised the government that Bulova could ship the NSV heavy machine guns right away if the government would "release the balance of the funding" (R4, tab 151).

31. On 30 July 2010, the government terminated Bulova's contract for default (R4, tab 160). By that date, Bulova was to have delivered all of the remaining 4,500 PKM medium machine guns under Mod. 2 but had not delivered any. The required delivery dates for the PSL sniper rifles under Mod. 2 (beginning 25 August 2010) had not yet come due (finding 23); about one-third of the rifles were in production at this time (R4, tab 156). The required delivery dates for the NSV heavy machine guns also had not yet come due; all NSVs were complete and ready for shipment (findings 17, 23; app. br. at 10; gov't br. at 22). The termination notice stated that the bases for termination included Bulova's failure to make progress so as to endanger performance, failure to deliver designated items when due (both under the original dates and Mod. 2), anticipatory repudiation based on Bulova's statements about its financial issues, and failure to submit a plan or explain use of performance-based payments within 10 days of the cure notice/show cause notice (R4, tab 160). Bulova appealed this decision to the Board on 26 October 2010.

## DECISION

*The Parties' Arguments*

The government argues that its termination for default was justified because Bulova repeatedly failed to perform under the contract based on original and modified delivery dates. Further, the government asserts that Bulova failed to give adequate assurances of performance in response to the cure notice and that Bulova's words and actions constituted an anticipatory repudiation of the contract. According to the government, the cause of Bulova's nonperformance was not allegedly defective EUCs but Bulova's failure to pay its subcontractors, which is not an excuse for nonperformance.

Bulova argues that the default was not proper because the government failed to provide acceptable EUCs and thus the deliveries were not delinquent, and asserts that its financial issues with its subcontractors were attributable to the EUC delays. With regard to revised dates under Mod. 2, Bulova states the modification is invalid for lack of consideration. Bulova denies repudiating the contract, stressing its continued attempts to perform and expression of willingness to perform. Finally, Bulova notes that the contract is in the nature of an "installment contract," making termination of the entire contract improper.

11

The original contract delivery dates were triggered by receipt of EUCs provided by the government; we determine this requirement to mean EUCs acceptable to the exporting countries. However, this scheme was revised by Mod. 2 for the weapons from Bulgaria and Romania; as a result, delivery of those weapons was *not* contingent on receipt of an acceptable EUC. Instead, Mod. 2 specified that delivery of the PKM medium machine guns was due between 15 and 25 June 2010, and delivery of the PSL sniper rifles was due between 25 August 2010 and 3 September 2010. (Finding 23)

Because bilateral Mod. 2 set up a new delivery schedule, the alleged EUC delay cannot now be considered as an excuse for performance problems relating to the PKM medium machine guns or the PSL sniper rifles. In agreeing to a new delivery schedule, a contractor erases the ability to raise pre-existing causes of delay. *Range Technology Corp.*, ASBCA No. 51943 *et al.*, 04-1 BCA ¶ 32,456 at 160,546 ("in agreeing to these new delivery schedules, the parties eliminated from consideration the causes of delay occurring before the mutually agreed extensions"); *Steelform, Inc.*, ASBCA No. 57724, 12-2 BCA ¶ 35,170 at 172,570 (non-delivery/default cannot be excused by causes of delay that existed before bilateral agreement to a new delivery schedule). There is no basis to revive the EUC issue for these weapons after issuance of Mod. 2.

To avoid this result, Bulova asserts that Mod. 2 is unenforceable because it provided no monetary consideration to the government for the delivery extensions and Bulova was only agreeing to perform a pre-existing duty (to deliver weapons) which does not constitute consideration (app. br. at 11-12; app. reply br. at 3-4). It is well established that a modification must be supported by consideration to be binding. *International Oil Trade Center*, ASBCA No. 55377, 08-2 BCA ¶ 33,916 at 167,829 (a contract modification must include all the elements necessary to support contract enforceability, including consideration). Further, under the "pre-existing legal duty" rule, a promise to do what one is already obligated to do is not consideration. *Gardiner, Kamya & Associates, P.C. v. Jackson*, 369 F.3d 1318, 1322 (Fed. Cir. 2004); RESTATEMENT (SECOND) OF CONTRACTS § 73 (1981). However, as explained below, the facts here do not support the conclusion that Bulova was simply agreeing to perform a pre-existing duty.

Under Mod. 2, the delivery schedule scheme was altered from that originally set forth, erasing the EUC issue and the risk that *either* side was not in compliance with contract requirements for that reason. The government agreed to different performance due dates (longer, in its view), giving up the possibility that it could terminate Bulova at that point for default for nonperformance; Bulova in turn also agreed to different performance due dates (shorter, in its view), giving up its position that Bulova was entitled to more time to perform because the EUCs were defective. By relinquishing these positions, which each side believed to be valid, the parties provided consideration

12

to support the new delivery schedule. RESTATEMENT (SECOND) OF CONTRACTS §§ 71, 74 (1981) (a promise by a party to forebear to take some action constitutes consideration if that party believes the claim to be valid); RESTATEMENT (SECOND) OF CONTRACTS § 73 (1981) (consideration is present if performance differs from what was required "in a way which reflects more than a pretense of bargain."). Here, both parties agreed to a new delivery schedule structure that effectively deprived each of either a potential right or a potential benefit; consequently, there was adequate consideration to support Mod. 2.

Bulova argues that Mod. 2 was invalid because the government knew about Bulova's delivery issues as of April, but essentially set Bulova up to fail with Mod. 2's "aggressive" schedule. Bulova cites *Aptus Co. v. United States*, 61 Fed. Cl. 638, 649-50 (2004), *aff'd by Lin v. United States*, 159 F. App'x 186 (Fed. Cir. 2005), for the proposition that "[w]hen the Government is aware of an issue with a contractor['s] performance and then, in spite of that knowledge, enters into a modification of the contract, it cannot later claim those performance issues as a basis for termination." (App. br. at 11) However, the *Aptus* decision, though not binding on the Board, is actually consistent with the case law cited above that a bilateral modification can start anew the parties' obligations without regard for pre-existing causes of delay, or in the *Aptus* case, known pre-existing contractor fraud. In any event, although the government knew of Bulova's performance issues before signing Mod. 2, Bulova had at least as much information about its delivery problems, schedule, and finances as the government, and yet agreed to the new schedule. Ultimately, Bulova has not presented facts or law to justify relieving Bulova of its obligation to comply with the new delivery dates of Mod. 2.

*PKM Medium Machine Guns (Bulgaria)*

Given that Mod. 2 is valid, the government could properly terminate the PKM medium machine guns for Bulova's failure to deliver. (The other two weapons will be addressed below). The last PKM delivery date was 25 June 2010, and by that date Bulova had not delivered any of the 4,500 PKMs covered by Mod. 2. Consequently, Bulova was in default of its obligations under the contract. The contract's Default clause allows termination if the contractor fails to deliver within the specified time (finding 6). Thus, termination for default was proper for the PKM medium machine guns from Bulgaria.

*Severability*

With regard to the other weapons, Bulova argues the contract was severable and that the entire contract should not have been terminated for default based on its failure to

13

deliver the PKMs under Mod. 2 (app. br. at 14).[9] The government asserts that the concept of severability does not apply here due to the broad scope of the supply Default clause, allowing termination "in whole or in part" for failure to deliver (gov't br. at 23).

Much of the Board case law on contract severability relates to construction contracts, as the Default clause for construction contracts specifically allows for severability. FAR 52.249-10(a). However, the concept of severability can still be applied to supply or service contracts, and indeed has been, in at least some cases. *See Consumers Oil Co.*, ASBCA No. 24172, 86-1 BCA ¶ 18,647 at 93,709-10 (requirements under one contract to supply fuel to different military or civilian activities, paid for by those separate activities, were severable requirements); *Plum Run, Inc.*, ASBCA Nos. 46091, 49203, 05-2 BCA ¶ 32,977 at 163,365 (addressing the government's failure to prove that a certain service sub-CLIN was not severable from the rest of the contract).

Several factors guide the analysis of severability, such as whether the items are capable of being performed separately, and whether the conduct of the parties suggests that the requirements are "separate in character." *Amplitronics, Inc.*, ASBCA No. 33732, 87-2 BCA ¶ 19,906 at 100,703 (addressing severability in the context of contract formation). In finding a construction contract not to be severable, the Court of Federal Claims outlined similar criteria in *Aptus Co. v. United States*, 62 Fed. Cl. 808, 812-13 (2004). These factors included: whether the contract required a single delivery date, the nature of the work, the contract's over-arching purpose, line item structure, and the intent of the parties. The court concluded the requirements were not divisible due to the "interdependent nature of the several tasks, and the unified purpose to which they are a part." *Id.*

Applying these factors here leads to the conclusion that the contract was severable. The overall contract was the result of two separate FMS "cases," with two different customers within Iraq (Ministry of Defense (the army) and Ministry of Interior (the police)) (finding 1). The different weapons were distinct from each other, with no interdependence, and were manufactured by different companies in different countries (finding 3). There was separate sub-CLIN structure, pricing, and delivery dates (findings 1, 3). The parties' conduct during performance confirms this interpretation. The government was planning to issue another modification, separate from Mod. 2, to address new delivery dates for the NSV heavy machine guns because of the EUC issue (finding 24). The CO indicated he might consider treating the items separately in

---

[9] Bulova uses the term "installment contract" as well; that term may best describe a contract with successive deliveries of the same item, not a contract with unrelated requirements documented on the same contract vehicle. It is well established that a default on an incremental delivery of a requirement can justify termination for default of that entire requirement. *Action Support Services Corp.*, ASBCA Nos. 46524, 46800, 00-1 BCA ¶ 30,701 at 151,684.

14

deciding on termination, depending on Bulova's response to the cure notice (finding 28). A line item for mortars had been terminated for convenience earlier with no impact on the rest of the contract (findings 1, 5). We conclude therefore that the contract was severable, and thus a separate analysis will follow as to the termination of the PSL sniper rifles and the NSV heavy machine guns.

*PSL Sniper Rifles (Romania)*

As of the government's 30 July 2010 termination for default, no PSL sniper rifles were due yet; under Mod. 2 delivery of those weapons was to start on 25 August 2010 and end on 3 September 2010 (finding 23). Thus the government could not terminate Bulova for failure to deliver the PSL sniper rifles, and, because the contract was severable, the government could not use Bulova's failure to deliver the PKMs to justify the termination of the sniper rifles.

However, the government could legitimately terminate the sniper rifles for default for failure to make progress, one of the bases for default set forth in the termination notice (finding 31). First, production status was a problem. Raw materials and some tooling had been purchased by RomArm, and about one-third of the sniper rifles were in production but production had not started on the remaining two-thirds (findings 17, 31), and delivery was due in just a month. Second, Bulova planned to pay for this work via the personal loan it expected to get and this money would not be received until 15 September 2010 (finding 30), *after* the due date for all the PSL sniper rifles. Despite Bulova's positive remarks about being committed to the contract, when most of the product has not been manufactured and funds to pay for all of the items would not be received until after the last delivery was due, the government could reasonably conclude that Bulova had not provided adequate assurances that it would be able to perform by the required dates.

Bulova argues that termination was not proper because its financial problems were the government's fault, primarily due to the EUC delays. However, as discussed above, in agreeing to Mod. 2, Bulova erased from consideration the EUC delays, and cannot now assert those as an excuse for performance problems with regard to the PSL sniper rifles. As to the other costs, the alleged unnecessary heat treatment of pallets only concerned the Serbian NSV heavy machine guns. The landing fees are an open issue, but the Disputes clause in the contract required Bulova to keep performing, even if the government was ultimately found liable for additional costs (finding 6). Thus, a dispute as to those costs cannot serve as a basis to excuse a slippage in delivery. For these reasons, the government's termination for default of the PSL sniper rifles was proper.

15

*NSV Heavy Machine Guns (Serbia)*

As noted above, Mod. 2 did not address the NSV heavy machine guns, so the delivery schedule for those remained as stated in the original contract, 270 days after EUC (finding 3). An acceptable EUC was not provided for Serbia until 14 July 2010 (finding 22). Delivery was not due until 270 days later; consequently, at the time of the termination for default on 30 July 2010, Bulova was not in default for this requirement. Because the contract was severable, the government could not use Bulova's failure to deliver the PKMs to justify the termination of the NSV heavy machine guns. Severability is particularly apparent here, when the government was obligated to provide an acceptable EUC for Serbia but did not do so until two weeks before the termination, with delivery not due for almost nine more months. To conclude that Bulova's other defaults encompass this requirement would be to find Bulova responsible for the government's performance failure.

Alternatively, the government argues that Bulova repudiated the contract for the NSVs by its remarks and presentation at the Aberdeen meeting on 16 June 2010, and by later statements trying to establish new delivery dates contingent on further payment (gov't br. at 24-26). Bulova counters that the government has not met its burden of showing anticipatory repudiation because there was no unequivocal expression of intent not to perform, and indeed, Bulova made comments to the contrary about continued performance (app. br. at 12-14).

In order to demonstrate anticipatory repudiation, the government must show that Bulova communicated an "intent not to perform in a positive, definite, unconditional and unequivocal manner," either by unequivocal statements of refusal to perform, or by actions amounting to actual abandonment of performance. *Troy Eagle Group*, ASBCA No. 56447, 13 BCA ¶ 35,258 at 173,061 (and cases cited therein). Whether a contractor's words or actions asking for more time or money to perform constitutes anticipatory repudiation depends on the facts of each case.

A number of cases finding anticipatory repudiation due to the contractor refusing to perform without being given more money have involved stronger language and less performance completion than present here. For example, in *DK's Precision Machining & Manufacturing*, ASBCA No. 39616, 90-2 BCA ¶ 22,830 at 114,638-39, the contractor said that without re-negotiation of the contract price, it "will consider the contract cancelled for the convenience of the government." Coupled with this language, there was no evidence of the contractor performing any work for a year before the cure notice was issued. The Board concluded that the contractor's "lack of progress and its stated position that it would not proceed unless the contract was renegotiated constitute an anticipatory repudiation." Similarly, anticipatory repudiation was found in *Free & Ben, Inc.*, ASBCA No. 56129, 11-1 BCA ¶ 34,719 at 170,955. The contractor demanded that the government issue an EUC (which the government said was not required) or approve a

different truck for delivery, otherwise "the delivery of these trucks cannot be fulfilled." The Board found that this definitive statement, confirming the contractor's inability to provide the required truck, constituted unequivocal intent not to perform and thus repudiation). *See also Smith Faison Military Sales Co.*, ASBCA No. 24229, 82-1 BCA ¶ 15,512 at 76,945-46 (contractor's statement that it was "not going to perform" on the contract without a price increase, coupled with its subcontractor going out of business, justified default).

Here, all of the NSV heavy machine guns had been manufactured (finding 17), unlike the facts of the cases above where little or no work had been performed. Also, Bulova's statements about performance were much more positive than those made in the cases cited above. Although Bulova repeatedly asked for payment of the rest of the contract as the fastest way to ship the weapons, Bulova also reported that private financing would be received by 15 September 2010. The plan was to use the private financing to fund performance of the other requirements, not the NSVs; but Bulova did not categorically refuse to perform the NSV requirement unless the rest of the contract money was provided. Indeed, Bulova said it was committed to contract completion (findings 27, 29). Bulova was repeatedly asking for more money as the fastest way to finish, but Bulova still had nine months to perform, with additional cash resources expected from private sources. Given that the government's actions contributed to the problem to begin with, these facts together do not amount to an "a positive, definite, unconditional and unequivocal" statement of intent not to perform. *Troy Eagle*, 13 BCA ¶ 35,258 at 173,061.

## CONCLUSION

For the reasons stated above, the appeal is denied as to the 4,500 PKM medium machine guns (remaining under CLIN 0005AA) and the PSL sniper rifles and scopes (CLINs 0004AF, 0004AJ, 0005AB). The appeal is sustained as to the NSV heavy machine guns (CLINs 0001AA, 0002AA, 0003AA, 0004AC), and remanded to the parties to determine quantum.

Dated: 28 January 2014

ELIZABETH M. GRANT
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

17

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

JOHN J. THRASHER
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

      I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57406, Appeal of Bulova Technologies Ordnance Systems LLC, rendered in conformance with the Board's Charter.

      Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

18